IRVING, J„
for the Court.
¶ 1. Verrie Jordan, administratrix of her father, Willie Finley’s, estate, on behalf of the estate and Finley’s wrongful death beneficiaries, sued Beverly Health and Rehabilitation Services, Inc. (Beverly), David Banks, and Charlie Sinclair, Jr.[1] alleging wrongful death, negligence, and medical malpractice, among other claims. After discovery, summary judgment on behalf of the Appellees was granted by the Circuit Court of Hinds County. Aggrieved, Jordan appeals and asserts the following issues, which we quote verbatim:
I. Whether the trial court erred in deeming Defendants’ requests for admissions admitted.
II. Whether the trial court erred in refusing to allow withdrawal of the deemed admissions.
III. Whether the trial court erred in granting summary judgment based on the deemed admissions.
IV. Whether the nursing home administrators and licensees owe a duty of care to residents.
¶ 2. Finding no error, we affirm.
FACTS
¶3. Finley was admitted to Beverly Northwest, a Jackson nursing home facility owned and operated by Beverly, after being diagnosed with terminal cancer. Finley left Beverly Northwest on March 3, 2000, and moved into the Whispering Pines Hospice, a facility designed to keep terminal patients comfortable until they expire. On April 2, 2000, Finley passed away. His death certificate indicates that the causes of death were cancer and paraplegia.
¶ 4. Jordan contends that staff shortages and other administrative problems at Beverly Northwest led to Finley being given negligent and sub-standard care. Specifically, Jordan alleges that negligent conduct caused Finley to suffer from severe pressure sores, falls, urinary tract infections, dehydration, malnutrition, pneumonia, contractures, and weight loss. According to Jordan, “[tjhese repeated insults to his health led to his death on April 2, 2000.”
¶ 5. During discovery, the Appellees proposed a request for admissions “asking the plaintiff to admit or deny whether each individual caregiver acted within the standard of care.” Jordan responded to the request with non-responsive answers. After receiving Jordan’s response, the Appel-lees filed a motion asking the court to determine whether the responses were sufficient. After the court determined that the responses were not sufficient, it ordered Jordan to file an amended response. Jordan complied, and her amended responses were also found to be insufficient. Upon motion from the Appellees, Jordan’s second set of responses were deemed admitted for failure to sufficiently respond to the request.
¶ 6. The deemed admissions conclusively established that all of the caregivers listed in the request had not deviated from the standard of care in treating Finley. Cole v. Buckner, 819 So.2d 527, 531(1113) (Miss.2002) (quoting M.R.C.P. 36(b)). Thereafter, summary judgment was granted on the basis that no caregiver had deviated from the standard of care, and Finley had therefore received adequate care while at Beverly Northwest.
¶ 7. Additional facts, as necessary, will be related during our discussion of the issues.
*1029 ANALYSIS AND DISCUSSION OF THE ISSUES

1. Deemed Admission of the Requests

¶ 8. Jordan alleges that the trial court erred in deeming the requests admitted, and argues that the deemed admissions “allowed Defendants to shoehorn Plaintiffs case into a theory Plaintiff did not wish to pursue.”
¶ 9. As acknowledged by Jordan: “Matters of discovery are left to the sound discretion of the trial court, and discovery orders will not be disturbed unless there has been an abuse of discretion.” Earwood v. Reeves, 798 So.2d 508, 514(¶ 19) (Miss.2001) (citing Dawkins v. Redd Pest Control Co., 607 So.2d 1232, 1235 (Miss.1992)). Rule 36 of the Mississippi Rules of Civil Procedure, which governs requests for admissions, dictates: “If the court determines that an answer does not comply with the requirements of this section, it may order either that the matter is admitted or that an amended answer be served.” M.R.C.P. 36(a).
¶ 10. In the present case, the first answers submitted by Jordan stated:
Defendants have now propounded 176 separate request [sic] for admissions in which they simplistically ask Plaintiff to admit that every single one of Defendant’s current and former employees did not fall below the appropriate standard of care in providing care to Willie Finley. By doing so, Defendants willfully ignore the fact that Plaintiffs complaint makes it very clear that the poor care Willie Finley received at Defendants’ nursing home was a result of corporate policies and a systemic program of un-derstaffing the facility and failing to provide adequate training and supervision and hiring of staff. Defendants created an environment in which their employees could not possible [sic] perform to the required standards due to shortages of staff and basic support. Thus, the named Defendants are directly responsible for all breaches in the standards of care provided to Willie Finley. Plaintiff objects to Defendants’ Request for Admissions as a disingenuous attempt to further disrupt Plaintiffs discovery efforts, as Defendants will undoubtedly provide copies of Plaintiffs responses to the individuals referenced in the requests. Should Defendants do so, then these individuals are hereby advised that Plaintiff does not attempt to lay personal blame for the systemic failures of Defendants’ nursing home on any particular nonman-agement employee or former employee (i.e. floor nurses, certified nurses’ aides, nurses’ aides, housekeepers, maintenance workers or groundskeepers, cooks, dietary aides, etc.) It is Plaintiffs position, based on medical records, and information obtained in discovery, that nonmanagement employees could not provide the appropriate standard of care to Willie Finley because of the actions of the named Defendants. In other words, the named Defendants caused the breaches in the standard of care by any of their nonmanagement employees and are responsible for such breaches.
Each separate answer then said: “Denied based on Defendants [sic] obstruction of the discovery process.” Jordan’s amended response stated:
The injuries of Willie Finley as alleged in Plaintiffs Complaint do [sic] not happen as a result of any one individual’s failure or breach of the standard of care. Instead, these injuries were the result of the cumulative impact of acts and/or omissions. The vast majority of allegations in Plaintiffs Complaint sup *1030 port this notion. The development of Willie Finley’s injuries occurred over a period of days, weeks and months. Some of these injuries were a result of acts of omission, not commission. Practically speaking no one charts their failures. Although evidence of omissions does exist in the form of blanks on grid-type charting, the lack of initials/names in these blanks makes it impossible to determine who failed to act as required. Therefore, it is impossible in a case involving long-term custodial neglect to identify any individual at fault, other than those whose [sic] implemented the policies that led to the injuries as suffered by Willie Finley.
Defendants created an environment in which their employees could not possibly perform to the required standards due to shortages of staff and basic support. Thus, the named Defendants are directly responsible for all breaches in the standards of care provided to Willie Finley. Plaintiff states that, while it may be impossible to determine precisely which of these individuals participated in providing care to Willie Finley, and discovery is ongoing in the effort to make that determination, the individuals named in these requests (and particularly those individuals whose names or initials appear in his medical records from the nursing home and whose identity may be determined by Defendants with greater ease than the Plaintiff) may have deviated from the standard of care in providing or failing to provide care to Willie Finley, but Plaintiff specifically limits this answer and clarifies that any such deviation on any individual caregiver’s part was the direct result of both negligent and grossly negligent failures by the named parties in this suit, such failures include, but are not limited to their failure to provide sufficient staff so that appropriate care could be provided to all residents of the facility, including Willie Finley; Defendants’ failure to properly supervise and train the staff who were present; Defendants’ failure to provide care givers appropriate supplies necessary to provide appropriate care to the residents; Defendants’ failure to create and foster a work environment for the staff that would be conducive to providing appropriate care to all residents of the facility, including Willie Finley; and the abilities of the facility and time constraints of the staff present in the facility; and other such failures as are stated in the Complaint and as will be shown at the trial of this matter. Plaintiff has not sued any individual caregivers [sic] in this matter and has no intention of amending the Complaint to do so; nor does Plaintiff intend to report any such deviation by any individual care giver to any governmental authority — as doing so would be fundamentally unfair since the care givers involved were often required to work in deplorable conditions and without sufficient assistance so that the facility could make more money. Given and subject to the explanation above, Plaintiff admits that the named individual did not deviate from the applicable standard of care.
If for any reason the above explanation is excluded, then Plaintiff states she can neither admit or [sic] deny as Defendants have failed to provide necessary and requested discovery documents and failed to have staff chart their acts and/or omissions in a significant manner, such that Plaintiff can determine if this or any individual specifically was within the appropriate standard of care.
Although Plaintiff believes that this individual did not breach the standard of care based upon the statement set forth above, Plaintiff, after reviewing the in *1031 formation readily available and a reasonable inquiry is without sufficient information to either admit or deny this request and therefore denies it.
After reviewing the amended response, the court deemed Jordan’s answers admitted.
¶ 11. According to Rule 36, an answer to a request for admissions
shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify his answer or deny only a part of the matter of which an admission is requested, he shall specify so much of it as is true and qualify or deny the remainder. An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless he states that he has made reasonable inquiry and that the information known or readily obtainable by him is insufficient to enable him to admit or deny.... If the court determines that an answer does not comply with the requirements of this section, it may order either that the matter is admitted or that an amended answer be served.
M.R.C.P. 36(a). The Mississippi Supreme Court has explained that:
While Rule 36 is to be applied as written, it is not intended to be applied in Draconian fashion. If the Rule may sometimes seem harsh in its application, the harshness may be ameliorated by the trial court’s power to grant amendments or withdrawals of admissions in proper circumstances.... The purpose of the rule is to determine which facts are not in dispute. It is not intended to be used as a vehicle to escape adjudication of the facts by means of artifice or happenstance.
DeBlanc v. Stancil, 814 So.2d 796, 801-02(¶ 26) (Miss.2002) (citations omitted). Jordan contends that “the trial court’s order here did just the opposite [as what the rule is intended to do.]” Jordan argues that her amended answer constituted the sort of “qualified denial” that is anticipated by the rule. After reviewing her amended response, we must disagree.
¶ 12. Since the purpose of the rule is to determine “which facts are not in dispute,” we find that Jordan’s answer worked against the purpose of the rule. The amended answer is difficult to follow and wavers from position to position. At one point the answer states that the Appellees “created an environment in which their employees could not possibly perform to the required standards ” and that “the individuals named in these requests ... may have deviated from the standard of care,” but the answer then goes on to say that “[g]iven and subject to the explanation above, Plaintiff admits that the named individual did not deviate from the applicable standard of care.” Jordan’s answer then states that if “the above explanation is excluded, then Plaintiff states that she can neither admit or [sic] deny ...” and finishes by saying “[although Plaintiff believes that this individual did not breach the standard of care ... Plaintiff ... is without sufficient information to either admit or deny this request and therefore denies it.”
¶ 13. Jordan’s amended answer is not the qualified denial that is contemplated by the rule. If a party feels that she cannot “truthfully admit or deny the matter,” then the party may “set forth in detail the reasons why the answering party cannot” admit or deny the request. M.R.C.P. 36(a). In her amended response, Jordan at one point admits that the caregivers did not deviate from the appropriate standard of care, states at another point *1032 that the caregivers did deviate (but were forced to do so by corporate policy), and finally states that she has insufficient information to either admit or deny the matter. This response did little or nothing to “determine which facts are not in dispute.” Also of import is the fact that this jumbled response only came after the court had already ordered Jordan to provide a sufficient response to the Appellees’ request for admissions.
¶ 14. Jordan urges us to find in her favor, as her case is based on a shortage of staff. Therefore, she contends, any negligence resulted from omissions in Finley’s treatment and not from a breach of duty by any particular employee. However, Jordan’s own answer contradicts this reasoning when it states, for example, that the “employees could not possibly perform to the required standards.” If the employees could not perform to the required standard of care, then one of them must have violated the standard of care, even if the fault was corporate policy and not the employee’s personal negligence. We understand that Jordan’s theory of liability was that “it was the Defendants who created the dire circumstances.” However, that theory of liability did not require that Jordan give the insufficient response that she gave. If Jordan’s theory of liability was truly that no employee had ever breached the standard of care, and that Beverly had negligently contributed to Finley’s death, then the response should have been a firm admission that none of the caregivers listed had breached the standard of care, and other evidence should have been produced to show that, regardless, Finley suffered an untimely demise due to a lack of adequate care.
¶ 15. If Jordan had specific instances where something had happened to Finley through an employee’s breach of the standard of care, then that incident should have been included in the response with an unequivocal statement that the caregiver had in fact breached the standard of care. Instead, Jordan chose to pursue a course of attempting to state on the one hand that employees had breached the standard of care and on the other hand that no employee had breached the standard of care. The court was within its discretion in choosing to deem admitted such a non-responsive answer.
¶ 16. Given the discretion awarded to trial courts in discovery matters, we find that the court did not err in choosing to deem Jordan’s amended response admitted. The amended response was contradictory and not in compliance with the rule. We also note that the court did not first pursue the harsher sanction of deeming the responses admitted, but instead gave Jordan the opportunity to amend her response and comply with the dictates of Rule 36. The court did not abuse its discretion in deeming the amended response admitted, and, therefore, Jordan’s first suggestion of error is rejected.

2. Withdrawal of the Admissions

¶ 17. Jordan next contends that the court erred in refusing to allow her to withdraw the admitted response and substitute sufficient answers.
¶ 18. Rule 36 states that “the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits.” M.R.C.P. 36(b). As with the court’s decision to deem the responses admitted, the court’s refusal to allow Jordan to withdraw the admissions is reviewed under an abuse of discretion standard. The analysis under Rule 36 requires that a court look at *1033 whether “the presentation of the merits of the action will be subserved [by allowing withdrawal]” and whether allowing withdrawal will cause prejudice to the party “who obtained the admission.” Id.
¶ 19. In the present case, Jordan’s motion to withdraw the admissions and replace them with new responses was submitted less than two weeks before trial was scheduled to begin, and only after the Appellees filed a motion for summary judgment. At the hearing for the withdrawal request, Jordan made it clear that she was now pursuing a different tactic, as she would contend in her new responses that almost all of the employees listed in the request failed to comply with the applicable standard of care. When asked by the court what prejudice they would suffer, the Appellees responded:
The fact that we’ve been preparing the case based on plaintiffs theory that they’ve been telling us all along that they don’t blame the care givers. Now they say they blame every single one of them. On Thursday of this of [sic] last week we got a witness list with 260 employees that they say they’re going to use to prove that none of the care givers complied with the standard of care. So basically the prejudice at this late point in the game, they’re changing theories on us, which affects the preparation of our case.
The Appellees also pointed out that the purpose of the request for admissions was to establish which employees Jordan believed had breached the standard of care, so that those particular employees could be questioned and deposed, a purpose that Jordan thwarted when she submitted non-responsive answers to the request for admissions. In response, Jordan’s attorney argued: “The injury here occurred in 1999 and 2000. The defendants owned this facility up until the middle of 2003. To say that they were prejudiced because they couldn’t talk to their people and figure out whether their people were at fault or not at fault under their theory, rings hollow, your Honor.” Jordan also suggested that she would be amenable to a continuance to give the Appellees adequate time to question the caregivers who were now listed as having fallen below the standard of care.
¶ 20. In ruling that the responses would not be withdrawn, the court pointed out that Jordan’s motion to withdraw the responses came less than two weeks before trial. The court further went on to explain that it found prejudice because:
it would be unfair prejudice for the defendants to have to respond to — in trial under the circumstances that they rightfully believe [sic] up until now that the answers were deemed to be admitted. And so they would have to prepare their witnesses in either direct examination or for cross-examination relating to the issues involving whether the particular care givers exercised the standard of care required.
¶ 21. Under the circumstances of this case, we find that the court did not abuse its discretion in denying Jordan’s motion to withdraw the admitted requests. The motion came less than two weeks before trial was set to commence, and only after Jordan had already been given the opportunity to bring her responses into compliance with Rule 36. The court did not err in finding that, under those circumstances, the Appellees would have been prejudiced by allowing Jordan to withdraw the admitted responses near the eve of trial. The court engaged in exactly the analysis that Rule 36(b) requires, and we find no fault with the court’s conclusions on the matter. Therefore, Jordan’s second contention of error is rejected.

*1034
3. Summary Judgment

¶ 22. Jordan argues in this issue that the court erred in granting summary judgment based on the admitted responses. Jordan specifically contends that “standard of care” is not defined in the request, and “what it means is open to debate. Plaintiff clearly reads the term to refer to whether the caregivers acted reasonably under the circumstances ... while Defendants seem to read the term as referring to whether Mr. Finley obtained the care to which he was entitled in spite of the deficient environment.” Jordan further argues that “ ‘standard of care’ is simply not an element of all of Plaintiffs causes of action. The complaint in this case alleged negligence, gross negligence and medical malpractice. Of these causes of action, only medical malpractice has compliance with a professional ‘standard of care’ as an element of the cause of action.” Jordan also contends that summary judgment should not have been entered because certain caregivers were left off of the admitted responses, namely Dwayne Gray. Finally, Jordan argues that summary judgment was improper as it did not answer the substance of her theory of the case:
Plaintiff has always contended that the individual care givers in this case delivered the best care that they could under the circumstances. They simply could not deliver appropriate care because of those circumstances, and those circumstances were created by Defendants’ corporate policies of placing profits over quality care. In Plaintiffs view, that means that the care givers did all that was reasonable under the circumstance [sic], thereby meeting the ‘standard of care,’ while Defendants systemically failed to provide the necessary staff, training and supplies a reasonable person would provide under the circumstances, and thereby deviated from the “standard of care.”
We find Jordan’s arguments on this point unpersuasive.
¶ 23. We review the grant or denial of a motion for summary judgment de novo. Powell v. Clay County Bd. of Supervisors, 924 So.2d 523, 526(¶ 6) (Miss.2006) (citing Miss. Farm Bureau Mut. Ins. Co. v. Walters, 908 So.2d 765, 768(¶ 9) (Miss.2005)). “A summary judgment motion is only properly granted when no genuine issue of material fact exists.” Walters, 908 So.2d at 768(¶ 9). We will review the record in “a light most favorable to the nonmoving party,” here Jordan. Powell, 924 So.2d at 526(¶ 10) (citing Rankin v. Clements Cadillac, Inc., 903 So.2d 749, 751(¶ 11) (Miss.2005)). If we find that no genuine issue of material fact exists, then we must reverse. Brooks v. Roberts, 882 So.2d 229, 232(¶ 7) (Miss.2004) (citations omitted).
¶ 24. For clarity’s sake, we will address each of Jordan’s specific arguments separately.

The Meaning of “Standard of Care”

¶ 25. We note first that Jordan never raised this issue with the court below, as no complaint was ever made that the meaning of “standard of care” in the request for admissions was ambiguous. As pointed out by the Appellees, Jordan’s “Response to Defendants’ Motion to Determine Sufficiency of Responses to Defendants’ Requests for Admissions” even acknowledged: “There is no question as to which standard of care is applicable to each Request.... ” Therefore, we find that Jordan is procedurally barred from raising this issue for the first time on appeal: “It is well settled that [we] will not address issues raised for the first time on appeal.” State Indus., Inc. v. Hodges, 919 So.2d 943, 947(¶ 9) (Miss.2006).
*1035 ¶ 26. We further note that, even if this argument were not proeedurally barred, there is no merit to it. In Cole, a party submitted the following request for admissions: “Request No. 2: Please admit that Dr. Buckner did not deviate from the standard of care in her treatment of decedent.” . Cole, 819 So.2d at 530(¶ 8). On appeal, the appellant contended that the request did not comply with Rule 36 because it did not contain a preamble of fact defining “standard of care.” Id. at 530(¶ 7). The Mississippi Supreme Court ruled that the appellant’s argument was without merit: “The requests clearly apply the legal standard of care to the facts of the case. The term ‘standard of care’ is sufficient to serve as a preamble of fact.” Id. at 530(118). The meaning of “standard of care” in the present case is equally unambiguous and sufficiently applies “the legal standard of care to the facts of the case.”
¶27. The Mississippi Supreme Court has recognized a “standard of care” applicable to negligence cases: “The standard of care applicable in cases of alleged negligent conduct is whether the party charged with negligence acted as a reasonable and prudent person would have under the same or similar circumstances.” Donald v. Amoco Prod. Co., 735 So.2d 161, 175(¶ 48) (Miss.1999) (citations omitted) (emphasis added). In short, it is clear that the concept of a “standard of care” has been applied in Mississippi in the negligence context. We find no indication that there is not an applicable “standard of care” in the context of nursing home attendants and negligence. Therefore, there was a discernible meaning to the “standard of care” phrase in the request for admissions. A near-rephrasing of the above standard also appears in Jordan’s complaint in her negligence count, where she alleges: “Defendants owed a duty to residents, including WILLIE FINLEY, SR, to provide adequate and appropriate custodial care and supervision, which a reasonably careful person would provide under similar circumstances.”

Dwayne Gray

¶ 28. Although Jordan’s attorney intimated to the court below that there were employees other than Gray who had been left off the request for admissions, no further names have been provided, either below or on appeal. While it is true that Gray was left off of the request, his exclusion is not sufficient to defeat the motion for summary judgment.
¶29. Gray was employed at Beverly until sometime around October of 1999, at which time the record indicates that he was terminated for poor work performance. By contrast, the deposition testimony of Dr. Leonard Williams, an expert employed by Jordan, indicates that Finley’s injuries did not start occurring until late November of 1999, after Gray had already been terminated.[2] Therefore, Gray’s testimony was irrelevant and insufficient to present a genuine issue of material fact.

Theory of Liability

¶ 30. In order to succeed on her claims, Jordan must show that any negligence on the part of Beverly was a proximate cause of Finley’s injuries. However, nothing in the record indicates that any action or inaction on the part of Beverly was a proximate cause of Finley’s injuries. Assuming that Jordan is correct, and that there were times when the facility was short-staffed and patients were left unat *1036 tended, nothing in the record indicates that Finley himself suffered as a result of the shortage in personnel. The former employees who testified regarding the shortages in staff were able only to testify about the general conditions at the Beverly facility. None of them could recall any specific instance where Finley received substandard care as a result of shortages in staffing or lack of supplies. In fact, most of the staff who were deposed could recall very little specifically about Finley.
¶ 31. While there was testimony to the effect that the personnel caring for Finley were short-staffed at certain times, no specific testimony was given regarding Finley. For example, Ardean Bullock, a certified nursing assistant who worked at Beverly Northwest while Finley was there, was asked: “During the time ... Mr. Finley was there, how common was it for the 11-to-7 shift to be short-staffed?” Her response was: “It was just about all the time.” When asked how the short-staffing affected Beverly’s care of its patients, Bullock testified that: “They couldn’t get turned like they’re supposed to, for one thing. They couldn’t go — you couldn’t go every two hours, you know, short of staff, go dry them and turn them every two hours like they’re supposed to.” However, Bullock pi'ovided no testimony specific to Finley. Her responses about the effect of the short-staffing on the nursing home patients was that it harmed “them.” No indication is given in her response that Finley specifically suffered any harm as a result of the short-staffing.
¶ 32. The only caregiver who indicated that she had a significant personal recollection of Finley was Clarice Bowman, who testified that Finley “would take a lot of care.” She then went on to testify that Finley’s family visited often, and that patients who had family that visited often were likely to receive more care because: “If a family showed that they really cared and was concerned about the resident, then, yes, you know, it would seem like it would be more attention, that’s from nurses and all, focussed [sic] on that resident.” This testimony not only fails to provide any causation evidence regarding Finley’s injuries, but actually undermines Jordan’s argument by indicating that, if anything, Finley received more care than other residents because he had family that visited him regularly. When asked about the severity of Finley’s pressure ulcers, Bowman testified: “I can’t speak on that because I don’t know.” When asked about the waist restraints that were used on Finley and that, according to Jordan, might have contributed to the falls he suffered while at Beverly Northwest, Bowman testified: “I couldn’t rightly recall Mr. Finley being tied in the bed.”
¶ 33. The record also contains a survey by the Mississippi Department of Health, finding numerous problems at Beverly Northwest. However, that survey was conducted after Finley died, and made no specific reference to Finley. As with the testimony of Finley’s caregivers, nothing in the survey served to link any negligence on Beverly’s part with Finley’s injuries.
¶ 34. Jordan also presented no evidence supporting causation through her expert witnesses. In her “Designation of Experts,” she submitted that Shannon Morgan, a nurse, would testify that: “the staff [at Beverly Northwest] failed to prevent pressure ulcers.... The staffs failure to adequately provide the care necessary ... resulted in the development of multiple pressure ulcers.... ” There is no indication that Morgan would testify that the lack of staff at Beverly caused Finley’s injuries; in fact, it was indicated that Morgan’s testimony would be that the failures of staff at Beverly led to Finley’s injuries. The same designation indicated that Dr. *1037 Williams would testify that: “The staff failed to provide the treatment necessary to prevent the development of several pressure ulcers.... ” Again, there was no indication that any of the injuries were caused by an absence of staff; only the failure of the treating caregivers to meet the standard of care was addressed.
¶ 35. Dr. Williams’s deposition testimony is no more helpful to Jordan. When asked, “what is the opinion or opinions that you have reached in this case,” Dr. Williams responded,
Beverly ... had fallen below the standard of care ... first in the aspect of their appropriateness with coming up with a plan to try and prevent his falls, which I think was inadequate.... Mr. Finley ... had become very seriously dehydrated without — which reflects that the staff were not providing adequate hydration and fluids to him and that the staff themselves were not quite aware of his condition .... And during his stay at the facility, [Finley] lost a considerable amount of weight without the facility being cognizant.... And the staff failed to render account that he was developing these contractures.
(emphasis added). When asked about the nursing staffs deviation from the standard of care, Dr. Williams explained that the lack of any mention of turning Finley in the nursing notes for several days led him to believe that “care was not being given.” However, this conclusion only indicates that whatever staff was there was either not turning Finley, or was not documenting their care of Finley. In the same testimony, Dr. Williams pointed to another failure of staff to meet the standard of care: “Having [already] found that pressure ulcer, the nursing staff should have been, you know, put on notice or put themselves on notice that there was a problem here, and we should have clear reflection in the nursing notes that they were aware of this pressure ulcer.” Dr. Williams did testify that Beverly failed to institute a care program to prevent Finley’s falls, but nothing in Dr. Williams’s testimony indicates whether this was a failure on the part of management, or the failure of a particular staff member who was supposed to institute care plans. We note that Dr. Williams then proceeded to testify that: “Even though they [the staff] said on the 17th they needed to care plan for falls, they don’t do it .... They are even indicating that there is some possible relationship between the soft waist restraints and the falls.” (emphasis added).
¶ 36. Morgan testified during her deposition that she believed that: “There wasn’t enough staff there to give the care,” but this testimony could only be based upon the survey conducted after Finley left the facility or upon depositions by others, as Morgan had no first-hand knowledge of the staffing at Beverly Northwest. Basically, she testified that, after reviewing Finley’s charts, the survey, and the other depositions, she believed that Finley’s injuries were due in part to a shortage in staffing. However, the rest of her testimony indicates only that there were pressure sores and it was not clear that the sores were properly treated. In other words, Morgan’s testimony supported either the theory that there was a lack of staff or that there was staff there that were not doing their job properly. Her conclusion that the former was the problem could only have been based upon the other depositions and the survey, as she had no personal knowledge to support her conclusion. Therefore, her testimony, was not sufficient to avert summary judgment.
¶ 37. Since there is no evidence in the record to create a genuine issue of material fact regarding whether Beverly was a *1038 proximate cause of Finley’s injuries, Jordan’s claims were properly dismissed at summary judgment.

Jp. Administrator and Licensee

¶ 38. In this point of error, Jordan contends that the court erred in finding that Mississippi law does not recognize a cause of action against Banks and Sinclair, respectively the licensee and the administrator of Beverly Northwest. Jordan contends that Rein v. Benchmark Constr. Co., 865 So.2d 1134, 1147(¶ 42) (Miss.2004) “has already settled this issue.”
¶ 39. In Rein, fire ants invaded a nursing home facility and a resident was “attacked, bitten and gravely injured by fire ants while lying in her bed at Silver Cross [the nursing home]. As a result, she died three days later.” Id. at 1137(¶ 3). The Mississippi Supreme Court found that the trial court erred in granting summary judgment to Natural Accents, a landscaping company that serviced Silver Cross, when “the proposal from Natural Accents to Silver Cross ... indicates that Natural Accents did indeed contract to provide ‘ant bed control.’ ” Id. at 1147(¶ 42). Jordan contends that “Thus, this Court has already held that the jury, not the court, should determine whether a landscaping company owes a duty to a resident of a nursing home. Clearly the trial court should have done likewise in this case and denied motions to dismiss the licensee and administrator based on their claim that no duty exists.”
¶ 40. Jordan argues that, even if Rein is not applicable, “the trial court should be reversed because administrators and licensees clearly do owe legal duties to residents .... Administrators and licensees are specifically charged with the duty to provide these [necessary] resources to residents, not to nursing home conglomerates who own the facilities.” In other words, Jordan contends that nursing home administrators and licensees owe a duty not only to the corporation that owns the nursing home, but also to the residents who live in the nursing home: “In essence, [the administrators and licensees] are the captains of the ship, the drivers of the truck, and the engineers building the bridge. Thus, they have independent duties to the residents to ensure that sufficient resources are available to provide the day-today care necessary for those residents.”
¶ 41. We find that we do not need to address Jordan’s arguments on this point because the matter is decided as a result of our analysis above. Jordan’s admissions conclusively found that none of the caregivers assigned to Finley had breached the standard of care. No genuine issue of material fact regarding causation has been produced by Jordan. In the absence of causation and a breach of the standard of care, no action can be maintained against Banks or Sinclair. Therefore, for the same reason as our analysis in Issue Three, we find that there was no error on the part of the court in granting summary judgment on behalf of Banks and Sinclair.
¶ 42. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ„ CONCUR.

. For clarity's sake, the Defendants below will be referred to as "the Appellees." Although Jordan sued on behalf of the estate, we refer to the Plaintiff below as "Jordan.”

. Dr. Williams indicated that Finley had fallen several times while Gray was employed there. However, Dr. Williams also testified that Finley sustained no injuries from these falls.