# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-00283-SCT

*FORREST GERMANY, A MISSISSIPPI
RESIDENT AND E.B. GERMANY & SONS, A
TEXAS CORPORATION*

*v.*

*DENBURY ONSHORE, LLC, AJIT JHANGIANI, A
TEXAS RESIDENT, ROSEWOOD PARTNERS,
L.L.C., A MISSISSIPPI CORPORATION AND
PIRVEST, INC., A TEXAS CORPORATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/19/2007 |
| TRIAL JUDGE: | HON. MICHAEL M. TAYLOR |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WAYNE DOWDY |
| | ANDREA ANN SANDERS |
| ATTORNEYS FOR APPELLEES: | TROY FARRELL ODOM |
| | WILLIAM F. BLAIR |
| | JAMES LAWTON ROBERTSON |
| | ELIZABETH GANZERLA |
| | CHARLES "CHAD" BARUCH |
| | ELIOT SHAVIN |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 06/19/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DIAZ, PRESIDING JUSTICE, FOR THE COURT:**

**STATEMENT OF THE CASE**

¶1.     The plaintiffs in this case entered into an agreement that gave them an option to purchase the right under another agreement to share in the acquisition of royalty interests in an oil and gas field. The plaintiffs claim that they did not exercise the option because the defendants prevented them from obtaining information essential to determining whether the right under the other agreement to share in the purchase of royalty interests was worth anything. Accordingly, the plaintiffs filed suit and asserted the following claims against several defendants, all but one of whom were parties to the agreement containing the option to purchase: breach of contract, intentional infliction of emotional distress, tortious interference with contract, bad faith, and conspiracy. The Circuit Court of Pike County granted summary judgment to the defendants on all claims asserted by the plaintiffs and dismissed the plaintiffs' complaint with prejudice. The plaintiffs appeal the trial court's dismissal of their complaint.

### FACTS AND PROCEEDINGS BELOW

¶2.     In 1993, Forrest Germany, President of E.B. Germany and Sons, a Texas corporation (Germany and Sons), began purchasing acreage in Pike County, Mississippi, on behalf of Germany and Sons that would eventually become part of an oil and gas field known as the McComb Field Unit (the McComb Field). Germany and Sons' interests in the McComb Field were passed through several corporations and ended up being assigned to Rosewood Partners, LLC (Rosewood) in 1997. Rosewood had been formed in March 1997, by Germany and Luther Henderson, the Chairman of Pirvest, Inc. Germany served as Rosewood's President and managed its daily affairs. Germany and Sons owned an approximately 4.4% interest in Rosewood, but that interest would increase to slightly more

2

than 18% upon its repayment of certain debts to Rosewood. Henderson owned a majority interest in Rosewood which was held primarily by Pirvest.

¶3.    Rosewood planned to employ tertiary oil recovery methods utilizing carbon dioxide at the McComb field. In order for tertiary recovery operations to be successful, a steady, uninterrupted supply of carbon dioxide is needed. Denbury Resources, Inc. (Denbury), owned the closest carbon dioxide pipeline to the McComb Field. A reservoir engineering report revealed that the McComb Field would produce 22.6 million barrels of oil. But an official at the company that produced the report told Germany that if Denbury operated the McComb Field, it would produce 30 million barrels of oil. Consequently, Rosewood contacted Denbury about purchasing Rosewood's interest in the McComb Field.

¶4.    On April 12, 2002, officials from Denbury met with Germany and Henderson and began negotiating the purchase of Rosewood's interest in the McComb Field. After an intense bargaining process, Denbury and Rosewood were finally able to agree on terms for the purchase of the McComb Field. On July 11, 2002, Denbury and Rosewood entered into a "Purchase and Sale Agreement"(the Purchase Agreement), pursuant to which Denbury paid an initial purchase price of $2,500,000. Denbury was also obligated to pay Rosewood "in any future month in which the price of oil . . . exceeds $22.00 per barrel . . . the difference between the actual price per barrel received by [Denbury] and $22.00 per net barrel times fifteen percent (15%) or $0/75 per net barrel of oil sold, whichever is less." This additional consideration is referred to by the parties as "the Price Sliver." Additionally, the Purchase Agreement contained a "non-competition covenant" by which Rosewood agreed that "any party affiliated or related to" it, including Germany, would not "acquire, directly or

3

indirectly, any mineral, leasehold, royalty or overriding royalty interest in the McComb Field Unit for a period of three (3) years from the date of closing."

¶5.     Denbury and Rosewood also entered into a "Letter Agreement" that was made part of the Purchase Agreement. Under the Letter Agreement, the parties "agreed to purchase and share various royalty and overriding royalty interests within the McComb Field Unit," subject to certain conditions. The agreement granted Denbury the "preferential and exclusive right to purchase the first one percent (1.00%) interest in either overriding royalty and or [sic] royalty interest or any combination thereof." Once Denbury acquired a one-percent interest, it would "share [with Rosewood] all future purchases and expenses fifty percent (50.00%) each until Rosewood has accumulated a one percent (1.00%) interest." The Letter Agreement further provided that "Denbury [would] make a reasonable attempt to purchase said royalty interests . . . , but [would] not be held responsible and or [sic] liable if it [wa]s unable to purchase or d[id] not purchase any additional overriding interests or royalty interests." The agreement also stated that it would terminate three years from the date it was entered into or when Rosewood had been assigned a one-percent interest, whichever occurred first.

¶6.     On September 22, 2002, Henderson sustained severe injuries in a car accident. He died a week later. Ajit Jhangiani, a Pirvest officer and member of Rosewood, was appointed executor of Henderson's estate; he also became President of Pirvest following Henderson's death. Jhangiani began questioning Germany's decisionmaking as Rosewood's President in late 2003. In October 2004, Germany learned from Henderson's son-in-law, Gregg Gapp, that Jhangiani had been negotiating on behalf of Rosewood with Denbury to sell it

4

Rosewood's rights under the Price Sliver and the Letter Agreement. Germany claims that he called Dean Edzards, Senior Landman for Denbury, and told him that Denbury should not negotiate with Jhangiani because he had no authority to act on Rosewood's behalf. According to Germany, Edzards became "irrate [sic] . . . and stat[ed] that he was dealing with [Jhangiani] on purchases of the Price Sliver and Letter Agreement, and that neither transaction was any of my business."

¶7. Germany filed a lawsuit on behalf of himself, his wife, and Germany and Sons in the Circuit Court of Pike County on October 27, 2004, against Jhangiani, individually and as the executor of Henderson's estate, and Rosewood.[1] In the complaint Germany asserted that he had entered into an agreement with Henderson before his death that provided that, after the sale of Rosewood's interest in the McComb field, (1) Germany and his wife "would be deeded a house owned by Rosewood in Brookhaven, Mississippi"; (2) "certain debt carried on the books of Rosewood in the name of . . . Germany and/or Germany and Sons would be forgiven"; and (3) "Germany would be either assigned Germany and Sons' share of the price sliver and override, or . . . would be paid in cash for the value of those interests."[2] Germany claimed that Jhangiani had knowledge of this agreement but refused to honor it as the executor of Henderson's estate. Accordingly, Germany asserted claims of breach of contract, tortious interference with contract, bad faith and intentional infliction of emotional distress against the defendants.

---

[1]One day later, Germany filed an amended complaint adding Pirvest as a defendant.

[2]Germany claims that the agreement was "in exchange for [his] efforts in putting together the McComb Field . . . ."

¶8.    On October 29, Germany's attorney, Charles Sartain, sent the attorney representing the Henderson Estate, Jay Anthis, a letter that documented the fact that Anthis had told Sartain that Jhangiani "ha[d] been offered close to $300,000 for Rosewood's rights in its July 11, 2002 letter agreement with Denbury Resources." Sartain sought additional information about the offer and inquired about whether Jhangiani had been trying to sell the Price Sliver. Further, he claimed that Jhangiani had been withholding information from Germany and that Germany believed that Jhangiani's "actions [were] for the purpose of stripping his and E.G. Germany and Sons' rights in Rosewood."

¶9.    On October 30, Jhangiani sent a notice that he, as President of Pirvest, was calling a special meeting of the members of Rosewood to "consider the disposition of the house situated in Brookhaven, Mississippi and a resolution of the debt of E.B. Germany and Sons, Inc. and Mr. Forrest Germany to [Rosewood]." According to Germany, "the notice process, [sic] involved irregularities that resulted in . . . Jhangiani being the only [member] present at the [special] meeting"; consequently, Jhangiani was able to "use[] his majority vote to collect [Germany's] debt to Rosewood, and to sell the Brookhaven house."

¶10.    Jhangiani subsequently agreed to settle Germany's breach-of-contract suit. The parties entered into and signed a "Settlement Agreement and General Release" (the Settlement Agreement) on December 22, 2004. Pursuant to the Settlement Agreement, the Brookhaven property was deeded and transferred to Germany and Sons; all debts and obligations of Germany and Germany and Sons to Rosewood, Pirvest and Henderson's estate were forgiven; and Germany was granted an option to purchase Rosewood's interest in the Letter Agreement for $125,000 which would expire ninety days from the execution of the

6

Settlement Agreement. The provision granting the ninety-day option states in pertinent part: "Immediately upon being asked by Denbury, Jhangiani will acknowledge Forrest Germany's right to assignment of Rosewood's interests in the Letter Agreement upon payment of the $125,000 as set out above, an [sic] will authorize Germany to discuss the Letter Agreement with Denbury, to the extent consistent with this paragraph." Germany insisted that this term be included in the Settlement Agreement, so he could discover whether or not Denbury had purchased a 1% royalty interest in the McComb Field; without Denbury's acquisition of a 1% royalty interest, Rosewood's right under the Letter Agreement to share in Denbury's future royalty purchases would not be triggered, and the Letter Agreement would therefore be worthless.[3]

¶11.    Germany sent a letter to Edzards on January 3, 2005, notifying him, misleadingly, that he had "received assignment of 100% of the [Letter] Agreement." On January 27, Germany sent another letter to Edzards in which he asked to "know the current status of [Denbury's] Royalty Acquisition Program" and requested a two-year extension of the termination date (July 11, 2005) of the Letter Agreement. In response, Edzards faxed a letter to Germany on February 3, stating that he had learned from Jhangiani that Germany had not yet exercised the option to purchase the Letter Agreement and that Denbury would not release any information about its royalty acquisitions until Germany exercised the option and produced written evidence of the acquisition of the Letter Agreement. On February 3, Sartain wrote Ray Albertson, the attorney who was holding the assignment of the Letter Agreement in

_____

[3]Germany could not discover on his own whether Denbury had purchased any royalty interests because Denbury purchased royalty interests in the McComb Field through another corporate entity.

7

trust, informing him of Denbury's refusal to release information about its acquisition of royalty interests and asserting that Jhangiani was not "acting in accordance with the Settlement Agreement." Soon thereafter, Germany called Jhangiani and asked him to authorize Denbury to disclose information about its purchase of royalty interests. Jhangiani allegedly told him, "I've done all I'm going to do, I've been talking with [Edzards] and if you can't come up with $125,000.00 we are going to cut you out." However, on February 7, Jhangiani sent a letter to Denbury, giving Rosewood's "authorization . . . for Germany to discuss the Letter Agreement with Denbury . . . ." This letter was not copied to Germany or Sartain; Germany did not become aware of its existence until his deposition was taken by the defendants in the instant case. Germany sent Edzards a fax on February 21 in which he asked Edzards to call him and proposed that they try to resolve the disclosure issue. The next day Edzards responded by sending Germany a fax that stated that Denbury would not extend the termination date of the Letter Agreement.

¶12. On March 18, 2005, four days before the option was set to expire, Germany filed a second suit in the Circuit Court of Pike County on behalf of himself and Germany and Sons against Denbury, Jhangiani (individually), Rosewood and Pirvest. In the complaint Germany asserted the following claims against all of the defendants: breach of contract, intentional infliction of emotional distress, tortious interference with contract, bad faith, and conspiracy. With regard to the breach-of-contract claims, Germany alleged that Denbury had breached the Letter Agreement by not making "reasonable efforts" to purchase royalty interests in the McComb Field, and that Rosewood had breached the Settlement Agreement by preventing him from obtaining information about Denbury's acquisition of royalty interests. Germany

8

subsequently filed an amended complaint and added a claim against all of the defendants for violating Mississippi's anti-trust statute, Mississippi Code Section 78-21-1, et seq. (Rev. 2001).

¶13. Germany never obtained the information about Denbury's royalty acquisitions and thus did not exercise the option. The option, therefore, expired on March 22. Moreover, Denbury acquired slightly less than one half of one percent (.5%) of the royalty interests in the McComb Field. Accordingly, Rosewood's right under the Letter Agreement to share in the future purchases of royalty interests was never triggered, and the Letter Agreement terminated on July 11, 2005.

¶14. The defendants filed motions for summary judgment on all of Germany's claims. The circuit court granted the defendants' motions for summary judgment on all claims and dismissed the complaint with prejudice. Aggrieved, Germany now appeals, raising the following issues: (1) the trial court erred by granting summary judgment to all defendants on the claims of tortious interference with contract, violating Mississippi's anti-trust statute, and conspiracy; (2) the trial court erred by granting summary judgment to Jhangiani, Rosewood and Pirvest on the claim of breach of the duty of good faith and fair dealing.

## DISCUSSION

### Standard of Review

¶15. This Court reviews a trial court's grant of summary judgment de novo. *Delahoussaye v. Mary Mahoney's, Inc.*, 696 So. 2d 689, 690 (Miss. 1997) (citations omitted). The facts are viewed in the light most favorable to the non-movant. *Collins v. Tallahatchie County*, 876 So. 2d 284, 286-87 (Miss. 2004) (citation omitted). A trial court's grant of summary

judgment shall be affirmed "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c).

**Did the trial court err by granting summary judgment to the defendants?**

¶16.    The trial court ruled that, because Rosewood's right under the Letter Agreement to share in royalty purchases had not been triggered, and the plaintiffs never acquired an interest in the Letter Agreement, the plaintiffs could not have suffered any damages as a result of the defendants' alleged refusal to provide them with information about Denbury's acquisition of royalty interests.  Accordingly, the court granted the defendants' motions for summary judgment on all claims on the ground that the plaintiffs had sustained no damages as a result of any of the defendants' actions or omissions.  The plaintiffs argue that, "even if the Letter Agreement never had any value, if [they] had received the information [they] w[ere] promised by Jhangiani in the Settlement Agreement, at the time [they] could have pursued a derivative action on behalf of Rosewood for Denbury's failure to make a 'reasonable attempt' to purchase royalty."

¶17.    It is undisputed that the Letter Agreement was worthless because Denbury never acquired 1% of the royalty interests in the McComb Field.  Accordingly, we find that there is no genuine issue of material fact as to whether the plaintiffs sustained any damages by not exercising the option, regardless of whether the defendants' alleged actions and omissions contributed to the failure to exercise the option.  "[S]ummary judgment is mandated where the respondent has failed to make a showing sufficient to establish the existence of an

10

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Smith ex rel. Smith v. Gilmore Mem'l Hosp., Inc.*, 952 So. 2d 177, 180 (Miss. 2007) (internal quotation marks and citation omitted). The plaintiffs' argument that they could have recovered damages by filing a derivative action against Denbury on behalf of Rosewood cannot be considered by this Court because the plaintiffs did not make this argument before the trial court.[4] *Purvis v. Barnes*, 791 So. 2d 199, 203 (Miss. 2001) (citation omitted). Even if they had made that argument, summary judgment would still have been properly granted by the trial court on all claims: if the plaintiffs had filed a derivative action against Denbury for its alleged failure to make a reasonable attempt to purchase royalties, they would not have recovered any damages because the Letter Agreement stated that Denbury could "not be held responsible and or [sic] liable if it [wa]s unable to purchase or d[id] not purchase any additional overriding interests or royalty interests." Accordingly, we find that the trial court did not err in granting summary judgment to the defendants on all claims.

## CONCLUSION

¶18.    For the foregoing reasons, the judgment of the trial court is affirmed.

¶19.    **AFFIRMED.**

---

[4]In their response to the defendants' motions for summary judgment, the plaintiffs' argument that they had sustained damages was based on a different theory: "[I]f Jhangiani and Denbury had not wrongfully conspired to prevent [them] from getting the information [they] needed to exercise [their] option under the Settlement Agreement, that [they] [sic] would have been the rightful holder of the Letter Agreement, and thereby have had standing to enforce its terms." This argument is also without merit, because Germany would not have exercised the option and purchased the Letter Agreement if he had been told what percentage of royalty interests Denbury had purchased.

**SMITH, C.J., WALLER, P.J., CARLSON, GRAVES, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**