# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-00067-SCT

*THE ESTATE OF HAMILTON PETER GUILLOTTE, BY AND THROUGH EDITH JORDAN, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF HAMILTON PETER GUILLOTTE*

*v.*

*DELTA HEALTH GROUP, INC., DIXIE WHITE HOUSE NURSING HOME, INC. AND PENSACOLA HEALTHTRUST, INC.*


| | |
|---|---|
| DATE OF JUDGMENT: | 12/05/2007 |
| TRIAL JUDGE: | HON. JERRY O. TERRY, SR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | SUSAN NICHOLS ESTES |
| | ANTHONY LANCE REINS |
| | DONALD RAFFERTY |
| | DOUGLAS BRYANT CHAFFIN |
| | GALE NELSON WALKER |
| ATTORNEYS FOR APPELLEES: | NICOLE COLLINS HUFFMAN |
| | LYNDA CLOWER CARTER |
| | DANIEL E. DIAS |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 03/19/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE GRAVES, P.J., RANDOLPH AND PIERCE, JJ.**

**GRAVES, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This is a case regarding the treatment of a resident at the Dixie White House Nursing Home (Dixie White House) in Harrison County, Mississippi. Following the resident's death, the plaintiff sued the defendants for allegedly mistreating the resident and causing him to suffer injury and death. The Circuit Court of Harrison County granted summary judgment to the defendants, and the plaintiff appeals from this judgment.

## FACTS

¶2. On November 13, 2001, Hamilton Peter Guillotte was admitted to Dixie White House, where he remained until September 21, 2002. During this period of time, Guillotte was hospitalized on several occasions. He left Dixie White House for the last time on September 21, 2002 and died two days later. On December 30, 2002, Edith Jordan, individually and as the administratrix of Guillotte's estate, initiated a lawsuit against the defendants asserting negligence, medical malpractice, malice and/or gross negligence, fraud, breach of fiduciary duty, a statutory survival claim, and a statutory wrongful-death claim. Jordan named as defendants Delta Health Group, Inc. (Delta Health Group), Dixie White House, Pensacola Healthtrust, Inc. (Pensacola Healthtrust), Scott Bell, Dennis Forsythe, William Trevvett, John Does 1 through 10, and Unidentified Entities 1 through 10 as to Dixie White House. The record reflects that Delta Health Group is a corporate entity that has had an ownership or controlling interest in Dixie White House since at least June 2000. The record also reflects that Pensacola Healthtrust entered into a lease agreement with Dixie White House and took over the operations of the nursing home from Delta Health Group in March 2002. Pensacola Healthtrust was the corporate entity operating Dixie White House at the time of Guillotte's

2

death. Scott Bell is the licensee for Dixie White House. Dennis Forsythe and William Trevvett were administrators of Dixie White House during the time Guillotte resided there.

¶3. After the initial pleadings were filed, discovery took place from 2003 until 2007. In December 2006, the trial court granted summary judgment to Dixie White House. In March 2007, the trial court dismissed Bell, Forsythe, and Trevvett from the action. In July 2007, the remaining named defendants, Delta Health Group and Pensacola Healthtrust (hereinafter the "Defendants") deposed Jordan's medical experts – Dr. Timothy Hammond and Luanne Trahant, RN. In August 2007, Jordan deposed the Defendants' medical expert, Dr. Robert Kelly.

¶4. On August 13, 2007, the Defendants filed a motion for summary judgment, arguing that Jordan's failure to identify by name the caregivers at Dixie White House who allegedly breached the standard of care was fatal to her negligence claims. Jordan filed a response to the Defendants' motion for summary judgment, citing deposition testimony demonstrating that nursing home staff breached the standard of care in caring for Guillotte. After hearing arguments from both parties, the trial court granted the Defendants' summary judgment motion on September 18, 2007. Jordan timely filed a motion for reconsideration, which was denied after a hearing. Jordan then timely appealed to this Court.

**ANALYSIS**

¶5. On appeal, Jordan argues that the trial court improperly granted summary judgment in part because it misinterpreted *Estate of Finley v. Beverly Health and Rehabilitation*, 933 So. 2d 1026 (Miss. Ct. App. 2006). The Defendants assert that the trial court properly granted summary judgment based on the holding in *Finley* and because Jordan failed to

3

present evidence of negligence on the part of Dixie White House staff or the corporate entities owning and operating Dixie White House.

¶6. The standard of review for a trial court's grant of summary judgment is de novo. *See, e.g.,* ***Germany v. Denbury Onshore, LLC***, 984 So. 2d 270, 275 (Miss. 2008) (citations omitted). When deciding to grant or deny summary judgment, a court must review the record before it and take all the evidence in the light most favorable to the nonmoving party. ***Id.*** The trial court's decision to grant summary judgment will be affirmed if the record before the trial court shows that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. ***Id.*** Viewing all the evidence in the light most favorable to Jordan, this Court finds that summary judgment was improperly granted as to Jordan's claims that individual nursing home staff members were negligent in caring for Guillotte. However, summary judgment was properly granted as to Jordan's claims that the Defendants were negligent in failing to hire an adequate number of staff, failing to properly supervise their staff, failing to properly train their staff, and failing to adopt adequate guidelines, policies, and procedures for documenting resident care.

I. **Whether Summary Judgment Was Properly Granted as to Claims that Individual Nursing Home Staff Members Were Negligent.**

A. **Jordan's Answer to Interrogatory Number Eleven**

¶7. The Defendants argue on appeal that Jordan cannot maintain that the Defendants are liable for the negligence of individual nursing home staff members because of Jordan's answer to an interrogatory. When reviewing a trial court's grant of summary judgment, this Court takes into account all evidentiary matters, including responses to discovery requests.

4

***Price v. Purdue Pharma Co.***, 920 So. 2d 479, 483 (Miss. 2006) (citing ***Aetna Cas. & Sur.***

***Co. v. Berry***, 669 So. 2d 56, 70 (Miss. 1996)). However, the standard of review remains the

same – all the evidence must be viewed in the light most favorable to the non-movant. ***Price***,

920 So. 2d at 483.

¶8.     The interrogatory in question is Interrogatory No. 11, which states:

> 11.    In your Complaint you allege the Defendants failed to discharge their obligations of care to Hamilton Peter Guillotte resulting in catastrophic injuries, etc. including those conditions detailed in subparagraphs thereunder.   As to each allegation, please specifically state the following:
>
> (a)    Each action or inaction which you contend supports your allegations;
>
> (b)    The name, address and telephone number of each individual you contend supports each allegation; and
>
> (c)    By way of request for production please produce a copy of any document you contend supports each allegation.

Jordan responded to the interrogatory with the following answer:

> (a)    Objection. This Interrogatory is unduly burdensome in that there are many acts and/or omissions alleged in Plaintiff's Complaint that caused multiple injuries to Hamilton Guillotte. This information is found in the medical records of Mr. Guillotte and will be further discovered by depositions in the course of this action. . . .
>
> Without waiving objections, Plaintiff has already stated to Defendants and to the Court that the injuries sustained by Mr. Guillotte are of a nature that they evolved over a period of time and were not necessarily directly caused by one specific person's actions or inactions on a specific date. Plaintiff's complaint makes it very clear that the poor care received at Defendants' nursing home was a result of corporate policies and a systemic program of understaffing the facility and failing to provide adequate training and supervision and hiring of staff. Defendants created an environment in which their employees could not possibly perform to the required standards due to shortages of staff and basic support. Thus, the named Defendants are directly responsible for all breaches in the standards of care provided to Hamilton Guillotte. Plaintiff does not attempt to lay personal blame for the systemic failures of Defendants' nursing home on any particular

5

nonmanagement employee or former employee (i.e. floor nurses, certified nurses' aides, nurses' aides, housekeepers, maintenance workers or grounds keepers, cooks, dietary aides, etc.)[.] It is Plaintiff's position, based on medical records and information obtained in discovery that nonmanagement employees could not provide the appropriate standard of care to Hamilton Guillotte because of the actions of the named Defendants. In other words, the named Defendants caused the breaches in the standard of care by any of their nonmanagement employees and are responsible for such breaches.

This interrogatory also calls for expert opinion testimony based upon a review of the full medical record, Defendants' discovery responses, and deposition testimony of employees of Defendants and other witnesses.

¶9. Based on Jordan's answer, she appears to have been pursuing claims based on the negligence of Dixie White House staff and based on the negligence of the Defendants. The answer itself makes clear that she claimed that individual caregivers could not possibly meet the standard of care, thus indicating that those caregivers breached the standard of care. At the same time, she also asserted that the Defendants were responsible for establishing corporate policies and creating the systemic environment in which Guillotte was allegedly mistreated. Jordan's answer shows that she is pursuing two theories of negligence, which are not inconsistent with one another. This Court finds that Jordan's answer to Interrogatory No. 11, particularly when viewed in the light most favorable to Jordan, does not preclude Jordan from pursuing claims based on the negligence of nursing home staff in addition to claims based on the negligence of the Defendants.

¶10. Although we reach this conclusion, we will nevertheless briefly address the Defendants' argument regarding *Finley*. *Finley*, 933 So. 2d 1026. The Defendants argue that, based on the Court of Appeals' decision in *Finley*, Jordan's answer limits her to pursuing claims of corporate negligence and forecloses her from pursuing claims based on

6

the negligence of individual nursing home staff members. *Id.* In *Finley*, which is also a nursing home negligence case, the defendants requested that the plaintiff admit that each individual caregiver acted within the standard of care. *Id.* at 1028. The plaintiff filed a nonresponsive answer and then filed an amended answer with leave of the trial court, which the trial court found nonresponsive. *Id.* at 1029-32. The trial court then deemed the plaintiff's nonresponsive, amended answer to be an admission. *Id.* at 1031. In so doing, the trial court found that the plaintiff had admitted that no individual caregivers breached the standard of care. *Id.* at 1028, 1031. Because the plaintiff also failed to present any evidence of corporate negligence, summary judgment was granted. *Id.* at 1031, 1035-38.

¶11. The Defendants assert that, because Jordan's answer to Interrogatory No. 11 is very similar to the first, nonresponsive answer to the request for admission in *Finley*, Jordan's answer precludes her from claiming that individual nursing home staff members were negligent. This Court does not agree with the Defendants' argument. In *Finley*, when the plaintiff's amended answer was found to be nonresponsive, the trial court deemed the request for admission admitted. Because of the nature of the admission, the plaintiff could no longer argue that the defendants were liable for the negligence of the nursing home caregivers. In this case, Jordan never admitted – through her answer to Interrogatory No. 11 or otherwise – that no caregivers breached the standard of care. Therefore, we find that Jordan's answer to Interrogatory No. 11 cannot prevent her from pursuing claims based on the negligence of individual nursing home staff members.

B.     **Evidence of Negligence of Dixie White House Staff**

7

¶12.    Since this Court finds that Jordan's answer to Interrogatory No. 11 does not preclude her from asserting claims against the Defendants based on the negligence of individual nursing home staff members, we will now address the Defendants' argument that Jordan failed to present evidence of specific breaches of the standard of care by specific caregivers. A de novo review of the record and of the depositions of Jordan's medical experts in particular demonstrates that there is ample evidence of specific breaches of the standard of care by specific caregivers with respect to Guillotte's care.

¶13.    The deposition testimony of Dr. Timothy Hammond and Luanne Trahant, RN, include evidence that the nursing home staff at Dixie White House breached the standard of care in providing care to Guillotte. Both Dr. Hammond and Nurse Trahant testified that the failings of the nursing home staff led Guillotte to suffer injury, and ultimately death. The evidence of negligence provided by Dr. Hammond and Nurse Trahant fell into six main areas of care: nutrition and hydration, skin wounds, urinary tract infections, falls, contractures, and diabetes. Dr. Hammond and Nurse Trahant also testified about documentation deficiencies, which affected several different areas of care.

***Nutrition and Hydration***

¶14.    Dr. Hammond and Nurse Trahant testified that Guillotte was not provided sufficient nutrients and water by nursing home staff. Dr. Hammond testified that

> they [i.e., the Defendants] did have a system, and part of the system worked. They [i.e., staff members] reviewed the weight loss and took certain measures. The problem was they did not follow through and the patient continued to have horrible nutrition.
> In other words, even though they [i.e., the Defendants] have a policy and procedure that starts a process, there is no one to see to it that policy and

8

procedure continues, to continue that process and have feedback if the initial response is not adequate. . . .

[T]hey did not realize they were not correcting the problem because the nutrition parameters remained terrible and, in fact, deteriorate[d] throughout the hospitalization. So the policy is inadequate in that it doesn't allow them to adequately assess the patient's weight. . . .

The issue is that the patient has continuing deterioration and needs nutritional parameters, which puts him at risk of other complications which he suffers, and he does not have an adequate assessment and reassessment and care-plan to continue to deal with it, and he has continued malnutrition and dehydration, which is ongoing and increasing in severity.

It is one thing to have some policy in place, but if it doesn't give you the assessment and delivery of care, it doesn't do the job.

He also testified as to the proper standard of care, which would have been to follow the Defendants' policy, conduct "[a]ssessment, reassessment and care-plan to make sure you got the initial parameters[] at least up to baseline," and "[a]sk[] for help. They should have been telling the doctor that his weight was still below the ideal weight." Dr. Hammond testified that although Guillotte was "losing weight and had poor nutrition when he came in," the nursing home staff "should have done a more thorough assessment and should have noticed [his low albumin levels]." Dr. Hammond also stated that "[t]he standard of care would have been met if they either corrected the nutritional parameters or documented that they had exhausted all options." He added later that the nursing home staff should have recommended that more laboratory work be performed in order to improve Guillotte's albumin levels.

¶15. As to the injury suffered by Guillotte, Dr. Hammond testified that he was "malnourished several months into his admission." He then clarified that Guillotte's "weight really begins to fall four months after he gets there . . . So we have good evidence of malnutrition in April of 2002." He also stated that Guillotte's prealbumin levels "suggested his nutrition was better at the start of his admission and then plummets." Dr. Hammond

9

testified that although Guillotte was "losing weight and had poor nutrition when he came in," the nursing home staff "should have done a more thorough assessment and should have noticed [his low albumin levels]." When asked whether the failures concerning Guillotte's nutrition resulted in nutritional deficits, Nurse Trahant testified that they

> resulted in a failure for the staff to change the plan to address his nutritional problems or skin problems. The care plan is what helps drive care. That's why we do it. We make an assessment; we develop a plan. We implement the plan. If it doesn't work, we re-evaluate it. They didn't give Mr. Guillotte the opportunity in those areas for them to determine if the plan was or wasn't working. It was real – in those months it was very haphazard, in my opinion. It was a hit and miss type of care and he suffered for it.

Nurse Trahant testified that during the period from March to May 2002, nursing home staff failed to intervene with respect to Guillotte's nutrition by not

> providing an accurate picture of his nutritional status by virtue of the intake and output, especially when there was a change in his condition when he came back to the facility on April 10th. They knew he had had problems with anemia; they knew he had had blood transfusions. They knew there were problems with mobility. Obviously, there were issues with nutrition at that point because he was on Megace, so that's first and foremost, is that they know what's going in and what's coming out so they can manage it. . . . And that's obvious from his drop in albumen [sic] that more likely than not he wasn't consuming what he was supposed to. His albumen [sic] level dropped to a dangerously low level.

¶16. As to documentation deficiencies related to nutrition, Nurse Trahant testified that there were discrepancies in the ADL (activities of daily living) records in March and April 2002. The main discrepancy was that the ADL records indicated that Guillotte was consuming 100 percent of his meals in March and April 2002, whereas on April 25, 2002, a comprehensive assessment indicated that Guillotte had appetite problems and did not finish his meals. Nurse Trahant stated that

it's very concerning to me that there's that much inconsistency when they [i.e., nursing home staff] knew from the time he was admitted that he was a nutritional risk and that they were going to have to be more vigilant as far as his nutrition area was concerned. And then, of course, once the wounds developed, it was even more important for that to happen and the assessments to be accurate, the team to be all informed of what's going on. So it was very concerning.

Also, Nurse Trahant found that, because the nursing home's documentation stated that Guillotte was consuming 100 percent of his meals, the use of a PEG (percutaneous endoscopic gastrostomy) tube seemed to be "a severe and quick decision." She stated that

> [t]hey [i.e., nursing home staff] say on April 30th he's having trouble swallowing. He's evaluated by speech therapy. And then at the same time that they're calling her to evaluate him, they're asking the son to consent to a PEG tube. And that all occurred on May 3rd. It just seems very acute. Based on my experience, there is usually some sort of longer term problem going on than a week before you decide to offer someone a PEG tube, based on the fact that the documentation that we talked about earlier does say he's had problems with his appetite, that he's ordered an appetite stimulant; he leaves portions of his meal uneaten, to me, seems to be where those inconsistencies are. And I'm not sure all the staff members were aware or apprized [sic] of the situation.

She agreed that "some of the documentation would support the consideration of a PEG, but the daily documentation doesn't support it."

¶17.    Nurse Trahant testified that the standard of care regarding the documentation of Guillotte's nutrition required that the care plan be updated as to

> [w]hy he wasn't eating. Who had identified that he wasn't eating. . . . What types of interventions were being tried? Was he on a special dining program? . . . Sometimes you have to change sensory stimulation. . . . So I would have expected them to try to figure out, number one, where are we having the problem? Is it environmental? He had poor teeth, they knew that. He had broken teeth. He had – they consistently documented on his oral – the status of his teeth. So is it that he had – they were painful; did he need some type of dental consult? But I mean, none of that is in there.

11

She noted that the Dixie White House staff failed to consistently document Guillotte's nutritional status.

¶18. Regarding the management of Guillotte's hydration, Dr. Hammond was asked whether "there is a balancing act that has to be done because you have to address their [i.e., patients'] volume overload issues as well as the dehydration issues." In response, he testified that

> [y]es, it is a balancing act, but we [i.e., the nursing home staff] fell off the trapeze with no net. You are allowed to go a bit one way or the other, but to be at 5 and 8.7 liters deficit in water, like I say, you fell off the trapeze with no net. You are so outside the balancing act, it is so outrageous and gross that it is just horrendous.

He also testified that upon reviewing laboratory results for Guillotte's hydration levels, nursing home staff should have "look[ed] at the patient." He added that "it's not only the physician, skilled nursing should know it, a nutritionist seeing these, a dietician seeing these should know. There are a number of professionals involved that should see this and say, 'We have a problem.'" He testified that the nursing home staff should have made "recommendations to a physician either to increase fluid intake, or if they don't know what to do, it's okay to ask for help. Ask the doctor to reassess. We have these abnormal labs, take another look. We have a consistent abnormality, please take another look." Dr. Hammond testified that if Guillotte had been given more free water, his dehydration ratios would have normalized. As for the injury suffered by Guillotte, it should be noted that Dr. Hammond testified that the immediate cause of death was "myocardial infarction, due to the consequences of sepsis, due to the consequences of dehydration."

¶19. Nurse Trahant also testified about the failure of the nursing home staff to provide adequate hydration to Guillotte:

12

> [T]he dietician had recommended, from the day Mr. Guillotte went into the nursing home, that he receive twenty-five hundred and ninety-one (2,591) ccs of fluid. Now, although there were not any intake and output records that I could find until he received his PEG tube in May, once they [i.e., nursing home staff] began documenting his intake and output in May and all through September, it was very evident to me that they consistently were not providing him with the amount of fluids that had been recommended by the dietician. And, in fact, the recommendation actually went up in June of '02 to twenty-eight hundred and sixty-seven (2,867) ccs. And that recommendation was in place until the end of July when they recommended twenty-seven hundred and forty (2,740) ccs, which is almost three liters of fluid a day. And that recommendation remained in place until he left the nursing home in September. And just from reviewing the intake and output, that was consistently not met, even though the nursing home knew he had been hospitalized more than once for urinary tract infection and dehydration and how important it is to give someone the proper amount of fluid to help minimize or even prevent those problems.

Nurse Trahant stated that because the nursing home staff members were aware of the factors that predisposed Guillotte to dehydration, they had a duty "[t]o provide him with pressure relief, hydration, nutrition consistent with his conditions, and to monitor him meticulously because of those conditions." She added that the nursing home staff "failed to notify Dr. Weaver that they were consistently not providing him with enough hydration, although in many instances . . . [t]hey knew exactly how much he was taking in, so that Dr. Weaver could have been afforded an opportunity to figure out why is it that he couldn't take it in or he needed to take in hydration in some other form to help assist him with those needs."

*Skin Wounds*

¶20.    Dr. Hammond and Nurse Trahant also addressed Guillotte's skin wounds, some of which are related to the failure of the nursing home staff to provide adequate nutrition and hydration. Dr. Hammond testified that "[w]hat I'm critical of is the fact that the dehydration and malnutrition predisposes him to infections. I believe if they had given him better

13

hydration and nutrition, he would have been less prone." When asked if Guillotte would not have suffered skin breakdown if a PEG tube had been inserted earlier, Dr. Hammond stated that

> if they [i.e., nursing home staff] had acted appropriately, reassessed him and gotten adequate nutrition through the PEG tube, then it would have helped, yes. I believe it would have prevented the skin problems and he would have healed them faster, and it would have put him at less risk for the sepsis that led to his death. And the dehydration issue goes along with the nutrition issues on that.

Dr. Hammond also stated that

> I believe they [i.e., nursing home staff] did not adequately assess, reassess, care-plan and treat predisposing causes of dehydration and nutrition. And that was particularly important because they should have been on notice that this is a patient who had a lot of predisposing factors. Then, they failed to adequately document and act on these lesions. How can you look after lesions when you have conflicting reports of how many there are and where they are?

¶21.　As to Guillotte's bedsores, Dr. Hammond testified that in order for the nursing home staff to meet the standard of care, "one of the major interventions is to realize there is a problem and ask for help." When asked what the standard of care required the nursing home staff to do with respect to turning and repositioning Guillotte, Dr. Hammond replied that "[t]here is no one right answer. It is like we discussed: You make a good initial assessment and then you reassess and make the appropriate adjustments." Dr. Hammond reiterated that

> [w]hat they [i.e., nursing home staff] were doing wasn't working. I'm not saying they used this type of dressing and they should have used that type of dressing. There are lots of ways to do it. Many of the choices they made were reasonable first attempts. But, again, it is an iterative process. You have got to assess, reassess, look for the failure of medical therapy or the onset of complications. . . .
> 　　What I'm saying is, they [i.e., nursing home staff] don't deliver the outcome, and they do not document that they are aware – they don't

14

adequately document that they are aware of that. They should have been asking for more help.

When asked if he was "of the opinion that all of his [i.e., Guillotte's] wounds were preventable," Dr. Hammond stated "[y]es, I am."

¶22. Nurse Trahant testified that the nursing home failed to properly provide care to Guillotte for his skin problems in that

> [t]here was no positioning schedule. Placing undue pressure on the sacral or coccyx area by sitting up in a wheelchair or geri chair can certainly promote skin breakdown. Once the wounds developed, beginning in April of '02, the documentation still does not support consistent repositioning and turning. In fact, there are nursing assessments that are done on a weekly basis during this time. There's a treatment section that outlines repositioning and what type of pressure devices they're using, what type of positioning devices and schedules they're using. And a lot of those, many of those are blank in that area. At the same time, on the CNA's [i.e., certified nursing assistant's] record there is either no documentation or inconsistent documentation for turning or how often they're turning. And there's a sheet that comes behind those ADL [i.e., activities of daily living] records that outlines nursing rehabilitation. There are all sorts of different areas for them to document on, and those are consistently blank throughout the – throughout the stay.

Nurse Trahant stated that it was her opinion that the standard of care required the nursing home staff to have taken steps to prevent pressure ulcers, including creating a turning schedule and documenting it. She testified that if preventive steps had been taken, "[c]ertainly it would have improved the likelihood that other [pressure ulcers] were not going to develop or the ones that were there were not going to get worse by placing pressure on them." Nurse Trahant stated that Guillotte's skin wounds were also a result of the fact that "he did not receive enough hydration," in addition to the fact that turning and repositioning were "not consistently being done." She also stated that, in her opinion, nursing home staff did not follow the appropriate policies regarding hydration and pressure ulcers.

15

¶23.   Dr. Hammond also testified about the inconsistent documentation of Guillotte's skin lesions.  He stated that

> if you look at the medical center records, there are wounds documented on admission on essentially every admission.  They are documented by the ER physicians, by the nursing admissions, by the M.D. admission, often discharge notes, and there are moderate multiple wounds on one occasion which leads to referral to the wound care center.
>
> What we find on the home, the good part about the hospital records is that many are done on the day of admission or the day of discharge, it gives us a fixed point.  The interesting part is when you go to the nursing home, some of the lesions overlap.  But many of these lesions are different to the ones they are seeing in the medical center and even are not internally consistent.

He added that

> given that there are lesions present each time the patient comes into Garden Park Medical Center, and some of them are not present on discharge, I have to say the vast majority of the lesions occurred at the nursing home.  I also have to say that the nursing home documentation is conflicting.  It is often delayed, which means I can't determine whether the home thinks they happened when he came in, and not only is it internally conflicting, it is conflicting with the wound care center in the hospital.

He further testified that the failure to properly document Guillotte's lesions caused him injury him because "I think it is very hard to adequately deal with lesions when you are uncertain how many there are, what they are and what the status is."

¶24.   Nurse Trahant also testified about the documentation deficiencies regarding Guillotte's skin conditions:

> After he developed wounds in . . . April of '02, I've got two return body assessments when he came back from the hospital, but there were no weekly skin assessments showing stages, sizes that were consistently and accurately documented during that time. . . . [T]here were entries, but it would be, you know, stage #3 to the sacrum, no size, no wound bed description, drainage. And then they [i.e., nursing home staff] would move on, and they might document another wound and actually put a size, but nothing else.  So they were just – they were very incomplete and very much below standard as far as

16

keeping up with his skin condition. . . And even the entries I found in the nurses' notes were not complete based on both [nursing home] policy and accepted practice and assessment of pressure ulcers.

Nurse Trahant criticized the nursing home staff for not being more proactive with regard to Guillotte's skin condition:

I'm of the opinion that they were very reactive in his care in regards to his skin. The turning and repositioning, the consistent documentation of that, the consistent documentation of providing his fluids, his food, should have been done way before his skin broke down. Once his skin broke down, then in June we do have some documentation of turning and repositioning, but it's not consistent throughout. And he does develop other wounds, foot wounds, hip wounds.

### *Urinary Tract Infections*

¶25. Dr. Hammond and Nurse Trahant addressed Guillotte's urinary tract infections. Dr. Hammond testified that the nursing home staff "could have also put surveillance in place to look for urinary infections earlier." Dr. Hammond was asked what the nursing home staff should have done to meet the standard of care and he responded that they should

treat the underlying problems, malnutrition and dehydration, and . . . monitor. If you have a man that comes in with a history of urinary tract infections, has the current urinary tract infection, why don't we have a better urine outline? Why aren't we recording some better urine parameters to make sure that we're not missing anything?

¶26. Nurse Trahant testified about the failings of the nursing home staff with respect to Guillotte's urinary tract infections:

[H]e was not being provided with the hydration that he would have needed to help flush out the urinary tract, especially in someone with an enlarged prostate and problems with urinary retention. It's interesting that when he came into the facility, while he was being toileted and having incontinent episodes, he didn't suffer from a UTI from October 26th until May of '02. The presence of the catheter increased his risk. I think it would have been important for the staff to evaluate, if they would return him to his toileting

17

program, see if having the catheter out affected any of the wounds or the ability to take care of those wounds. And if not, leave it out. They knew he was at risk. He had not had problems before. In my opinion there was no reason to have the catheter if he could have been maintained without it or even with an external catheter.

She further testified that "[j]ust based on the fact that he didn't have any [UTIs] from 10/26 until May, just from my nursing opinion would be that [sic] it was more likely than not the presence of the catheter at that point, without giving you a medical causation. He certainly was at increased risk with the Foley [catheter]." Nurse Trahant was of the opinion that the standard of care required that the nursing home attempt removal of the Foley catheter and try a bladder continent program or attempt an external catheter instead of leaving him with the Foley catheter. She testified that

what the standard requires is that a person who is assessed as losing bladder function, and that's straight from the Federal regulations, that the staff is going to attempt to restore as much as possible without catheterization. So it's still the staff's responsibility to talk with the doctor, explain what they want to do, and remove it and try a program. Instead, when they did do the bladder assessment for bladder program on him on June 4th of 2002, they just simply documented that he had a Foley catheter. And there was no assessment of his bladder function at that point, what could be done, if anything, if the doctor was notified, if the doctor did agree, didn't agree.

¶27. As for documentation deficiencies related to Guillotte's urinary tract infections, Nurse Trahant testified that "the hygiene practices of the staff are not well documented in the records. The ADL record does not account for when bowels were taking place, providing the consistent perineal care, especially once he got the catheter. It's lacking in documentation as far as them consistently providing that care."

*Falls*

18

¶28.  Both of Jordan's experts also testified about the falls that Guillotte suffered at Dixie White House.  Dr. Hammond stated that after Guillotte suffered a fall on October 27, 2001, the nursing home staff failed to meet the standard of care by failing to "assess, reassess and care-plan" and by failing to take steps to intervene to try to prevent subsequent falls.  Dr. Hammond testified that "I think the pattern of being found on the floor and not making new interventions, particularly with the wheelchair, does breach the standard of care."  He added that "[t]hey [i.e., nursing home staff] should have reassessed him and said, now we have multiple incidents and we have to protect this man, whether it is more staffing or whether we provide changes in the wheelchair, wheelchair aids."

¶29.  Nurse Trahant also testified about Guillotte's falls: "My specific problem was in April of '02; they [i.e., nursing home staff] had an order that was put into place to keep him safe, and it was not implemented the day that he fell, April 30th."  She further testified that on

> April 26th, the nursing home received an order for Mr. Guillotte to be up in the geri chair.  The specific reasoning for that was because he was having a lot of positioning problems in the wheelchair, and he had already fallen out of the wheelchair March 1st because of these positioning problems.  Yet, based on the nurses' notes, on April 30th, when he fell, it was documented that he fell face forward out of the wheelchair.  And my specific criticism is if they have the order, he should have been in the geri chair at that point.

Nurse Trahant also had a criticism of the fact that there was

> a failure to update in relationship to his falls.  They [i.e., nursing home staff] put the March 1, 2002 fall on there, and indicated that they were trying to – he fell because they were trying to attempt a least restrictive measure.  And then they updated on 4/26 to reflect that he was supposed to be in a geri chair.  But once he fell out of the wheelchair on 4/30, which he was not supposed to be in, they didn't update the care plan at that point.

19

She added that "I don't think it was appropriate for Mr. Guillotte to have a self-release belt without being able to understand his risk for harm by undoing it himself and getting up. They [i.e., nursing home staff] knew his history."

***Contractures***

¶30. Dr. Hammond testified that he was critical of the fact that the nursing home staff ceased physical therapy for Guillotte, which Guillotte needed in order to maintain a range of motion in his limbs. Dr. Hammond stated that "given he was getting progressive contractures, you would have thought they [i.e., nursing home staff] would have been more aggressive." When asked whether or not Guillotte's contractures were preventable, Dr. Hammond testified that "[e]arly on, yes, they could have prolonged the time to contractures, and some of them may have been entirely preventable. . . . I believe that the onset and progression could both have been delayed with appropriate therapy."

¶31. In addition, Nurse Trahant was critical of the nursing home for failing to continue physical therapy for Guillotte after May 14, 2002. She testified that if the nursing home staff members had continued providing restorative services to Guillotte, they could have prevented his contractures from developing, improved his positioning and circulation, and decreased his pain. She stated that if the nursing home staff had continued providing restorative care to Guillotte,

> they would have provided a range of motion. . . . [T]hey should have . . . provided that to help not only with his arthritis and to lower his pain, he was on some very strong pain medication at this point, also improve his circulation and ultimately help in positioning. Because as the range of motion was not provided and the contractures developed and worsened, that's also when the documentation started that he was developing right great toe wound, ankle

20

wounds, areas that would have been more prone to pressure due to positioning problems because of the legs being drawn up or contracted up.

She further testified that: "I think Mr. Guillotte would have benefitted from being picked back up by restorative in June. There were no documented reasons why they [i.e., nursing home staff] couldn't pick him up" and administer rehabilitative services.

¶32. Dr. Hammond testified about documentation deficiencies regarding Guillotte's contractures as well. He stated that

> the nursing home does document the increased loss of voluntary movement and that it is bilateral over time, but the hospital is seeing these changes and documenting them way before the nursing home. . . . What worries me is the doctors and nurses at the medical center are seeing these changes and documenting them way before the home.

He added that in addition to accurately documenting Guillotte's contractures, the nursing home staff "need[ed] to document carefully why they [were] not intervening if they [were] not going to." Dr. Hammond testified that "they had a responsibility to maintain that [i.e., no negative change in Guillotte's range of motion], if that's what they believed the status was, or to reassess based on the fact that they had dramatically conflicting information from the hospital."

***Diabetes***

¶33. Dr. Hammond provided testimony regarding the nursing home staff's failure to properly manage Guillotte's diabetes. He also testified that Guillotte had "[p]oorly controlled diabetes," which "means you are at risk for secondary complications, such as glycosuria, such as infections, et cetera." Dr. Hammond stated that the nursing home staff and Guillotte's physicians failed to meet the standard of care regarding his diabetes. He

21

added that although a physician orders the glucose tests, "there is absolutely nothing to stop the home from asking for a reassessment or making suggestions. My experience is that staff are seldom shy to do that." He stated that the nursing home staff breached the standard of care by failing "to assess, reassess and care-plan and see whether they thought the glucoses were appropriate or if they were uncertain, ask the physician for intervention. Ask for more help. They don't have to manage it, they just have to know when they have a problem and ask for help." Dr. Hammond also testified that if the nursing home staff had notified the physician more often about Guillotte's glucose levels,

> hopefully, he [i.e., the physician] would have intervened and gotten better glucose control. Better glucose control would have led to less risk of infection, less risk of dehydration, and that would have changed – it would have prevented the new onset of decubiti [i.e., bedsores]. It would have helped it heal faster, it would have made him less prone to infection, and it would have allowed him to protect his carry of blood through the terminal event and to support his hemodynamic instability which led to his urosepsis. So it would have changed his outcome.

### Guillotte's Death

¶34. Nurse Trahant provided testimony concerning the period immediately preceding Guillotte's death. She stated that

> [o]n September 11 they document that he has fever. The physician is not notified; they give him Tylenol. On September 13th he runs [a] fever again, a hundred and two (102). They – this time they do notify Dr. Weaver, and he prescribes Rocephin to be given, which is an antibiotic. So they give Mr. Guillotte the antibiotic, and then on 9/21, at 2:00 in the morning, they document that he has got faint respirations. He's very restless, congested, and they document that he's very warm to the touch. They give him a breathing treatment, put him on oxygen and that's it. They don't call the doctor; there is no reassessment of his lung status other than they document at 3:20 that he's resting quietly. At 11:30, which would be 11:30 a.m., so eight (8) hours and ten (10) minutes after the fact, there is no nurses [sic] notes that anyone went back in to recheck him after this event. Nobody checked his vital signs.

22

Nobody listened to his chest. They go in and he's having Shane stokes breathing, which is a very ominous sign for someone's medical condition. That's – a lot of times when patients are dying that's the type of respirations that they will exhibit. He's got a hundred and three point five (103.5) if you were taking it orally. He's oxygen deprived. He's got a very low oxygen saturation. I mean, he's extremely sick, signs and symptoms of shock. And once he gets to the emergency room, they do document a very, very low blood pressure. He was extremely ill and septic at that point. And they diagnosed him with sepsis, dehydration, hypoxia or lack of oxygen to the brain. And he ultimately, based on the records, dies. And the discharge diagnosis indicates that he was septic.

She testified that a physician should have been notified on September 11 and September 21, 2002, and that the nurses should have properly documented Guillotte's condition.

¶35. After a de novo review of the record before the trial court, taking the evidence in the light most favorable to Jordan, it is clear that there is a genuine issue of material fact as to whether Dixie White House staff members breached the standard of care, causing Guillotte to suffer injury and death.

> **C. Whether Allegedly Negligent Nursing Home Staff Must Be Identified by Name.**

¶36. Despite the evidence in the record supporting Jordan's negligence claim, the Defendants argue that the failure of Jordan to identify the nursing home staff members who negligently cared for Guillotte is fatal to her claims. More specifically, the Defendants claim, and the trial court agreed, that *Finley* stands for the proposition that a plaintiff must identify by name those individuals who allegedly breached the standard of care. *Finley*, 933 So. 2d 1026. This Court finds this argument without merit. Nowhere in the *Finley* decision does the Court of Appeals set out this proposition. Moreover, it does not make sense that a plaintiff's claim can be defeated on summary judgment just because individual names are not

23

given when there is a significant amount of expert testimony, summarized above, regarding individual staff members' negligence. Clearly, the Defendants are in a better position to review and interpret the medical records, which are generated and maintained by the Defendants, in order to identify the employees who cared for Guillotte.

¶37. The Defendants focus on the portions of the depositions where Dr. Hammond and Nurse Trahant stated that they could not identify individual staff members by name based on the incomplete or illegible entries in the medical records. However, the depositions as a whole clearly indicate that individual staff members breached the standard of care, causing Guillotte injury. Dr. Hammond repeatedly stated that individual nursing home staff members and Guillotte's physicians shared responsibility for failing to ensure that Guillotte received proper care. With respect to Guillotte's diabetes, Dr. Hammond explained that the partnership between the nursing home staff and the physicians meant that:

> [I]f I am a doctor and someone tells me someone's blood glucose has been up consistently for the last month about three to 400, I'm going to make a whole new plan. If I am told I have one glucose of 300, I will probably give them a little insulin and not worry about it.
> So part of the partnership is making sure the doctor has the right information. . . . I don't believe the doctors would have done the things they did with glucose, wound care or nutrition, dehydration if they had adequate information.

Dr. Hammond testified that "I think it is a systemic failure, meaning that *there are many individuals that breached the standard of care*, all right? And that they share a responsibility with the home. But it is essentially the home which is failing to deliver the standard of care." (Emphasis added.) Dr. Hammond further stated that he felt that "I think there are a lot of individuals that breached the standard of care. . . . [T]he nursing home doesn't actually do

24

anything, all right?  *It is people who do things.  So it is the people who breached the standard of care.*"  (Emphasis added.)

¶38.    It is worth noting that the Defendants' medical expert, Dr. Robert Kelly, also admitted that, based on the entries in the medical records, he could not provide full names for the individuals who provided care to Guillotte during his residence at Dixie White House.  The fact that the individual names of those staff members were not identified should not defeat a claim of negligence that is supported by evidence, especially when the Defendants are in the best position to identify by name the individual staff members who cared for Guillotte.

**D.      Jordan's Attorney's Statement at Dr. Hammond's Deposition**

¶39.    The Defendants also contend that summary judgment was properly granted because Jordan's attorney, Anthony Reins, stated at Dr. Hammond's deposition that no testimony would be presented at trial regarding specific caregivers.  The trial court mentioned that Reins' statement supported the trial court's decision to grant summary judgment.  Reins made this statement during an exchange with the attorney for the Defendants, Lynda Carter:

> Q:            [A]t the time of trial, are you [i.e., Dr. Hammond] going to be providing opinions that this nurse, this aide, this dietary person, this employee of the facility breached the standard of care?
>
> Mr. Reins:   Let me assure counsel on the record, so you can avoid any surprise or unfair prejudice at trial, there will be no opinions as to specific caregivers.  There will be the testimony which he gave today and that will be his only testimony at trial, which will be the deviation from the standard of care and the outcomes that resulted therefrom.
>
> Ms. Carter:  And those deviations are from a systemic failure facility-wide?
>
> Mr. Reins:   I think we all can agree that care is delivered through individuals.  So, obviously, that kind of care is delivered.  But so there is no surprise, no ambush, you will know the standards of care that have been violated.  You have been told those today.  But nobody is in a better position than you and your clients to

25

know who was supposed to be giving that care on a specific day. You guys tell us that, we will be happy to answer.

Ms. Carter: My question is, if he is going to come to trial and provide opinions that particular employees of the facility, whether they are nurses, nurses' aides, dietary, cooks, et cetera, breached the standard of care and/or caused harm or damage to Mr. Guillotte, we are entitled to know that.

Mr. Reins: What he is going to testify at trial to is exactly verbatim what he has told you today.

Thus, although Reins stated that Dr. Hammond would not give opinions as to specific caregivers, given the context of his statement, it is clear that he meant that Dr. Hammond would not be testifying about individual nursing home staff members *by name*. Reins explicitly stated that Dr. Hammond would be testifying about the ways in which the nursing home staff breached the standard of care in treating Guillotte, just as he had testified at that deposition. He also stated shortly after the exchange with Carter that "my expert is not going to testify as to the caregivers by name who fell below the standard of care."

¶40. In spite of Reins' statement at Dr. Hammond's deposition, the expert testimony of both Dr. Hammond and Nurse Trahant clearly demonstrates that there were specific breaches of the standard of care by individual nursing home staff members, though the experts could not identify the staff members by name. Moreover, to the extent that Reins' statement must be considered when reviewing the decision to grant summary judgment, this Court views the evidence in the light most favorable to the nonmovant. *Price*, 920 So. 2d at 483. Viewing Reins' statement in context and in the light most favorable to Jordan, the statement does not foreclose Jordan from arguing that individual nursing home staff members were negligent.

¶41. This Court finds that Jordan's answer to Interrogatory No. 11, the Court of Appeals' holding in *Finley*, and Reins' statement do not preclude Jordan from pursuing claims based

26

on the negligence of individual nursing home staff members. This Court also finds that there is ample evidence in the record supporting this claim. Therefore, we conclude that summary judgment was improperly granted as to this claim.

**II.     Whether Summary Judgment Was Properly Granted as to Corporate Negligence Claims.**

¶42.    Jordan also claims that the Defendants are liable for corporate negligence. Jordan asserts that the Defendants were negligent in failing to hire an adequate number of staff members for Dixie White House, failing to properly supervise nursing home staff, failing to properly train nursing home staff, and failing to adopt adequate guidelines, policies, and procedures for documenting resident care.

¶43.    There was no evidence in the record regarding the Defendants' duty and the standard of care as to hiring, supervision of staff, training of staff, and documentation procedures. There was also no evidence in the record with respect to the Defendants' breach of the standard of care and causation under any of the four assertions. The record only contains evidence relating to two of the corporate negligence claims – hiring and training. However, the evidence is not sufficient to support all four elements of negligence as to either claim.

¶44.    First, concerning the claim that the Defendants failed to hire an adequate number of staff for Dixie White House, Dr. Hammond admitted in his deposition that:

> [T]he only evidence I have for lack of staffing, only specific evidence is in the surveys where they say that activities were not done if the patient could not leave the room, which suggested to me there was a lack of staffing. Many of the failures we see here today are consistent with a lack of staffing.

The surveys to which Dr. Hammond referred were administered as part of a complaint investigation of Dixie White House and were completed in May 2001, before Guillotte was

a resident of the nursing home. Therefore, to the extent that the surveys may demonstrate that Dixie White House breached its duty by failing to hire adequate staff, there is no evidence demonstrating that this caused injury to Guillotte, since the surveys encompass a time period prior to his residence at Dixie White House.

¶45. Second, as to the claim that the Defendants failed to properly train Dixie White House staff, Nurse Trahant testified that appropriately trained nurses and CNAs should have known that the failure to provide care for Guillotte, to develop a comprehensive care plan, to properly treat pressure sores, and to properly maintain the Foley catheter could lead to problems. However, no evidence was presented as to the Defendants' duty to train the nursing home staff. Therefore, evidence of a breach of that duty is lacking.

¶46. Accordingly, we find that, viewing the evidence in the light most favorable to Jordan, there is no evidence to support Jordan's corporate-negligence claims. The record contains no evidence that the Defendants breached their duty as corporate entities, causing Guillotte injury. Thus, this Court finds that summary judgment was properly granted as to the corporate-negligence claims.

**CONCLUSION**

¶47. This Court finds that summary judgment was properly granted as to Jordan's claims that the Defendants were negligent in failing to hire an adequate number of staff, failing to properly supervise their staff, failing to properly train their staff, and failing to adopt adequate guidelines, policies, and procedures for documenting resident care. However, this Court finds that summary judgment was improperly granted as to Jordan's claims based on the negligence of individual Dixie White House staff. Therefore, this case is affirmed in part

28

and reversed and remanded in part to the trial court for proceedings consistent with this opinion.

¶48.    **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**