# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-01932-SCT

*HERBERT LEE, JR.*

*v.*

*GLORIA THOMPSON AND DEBORAH DIXON*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/31/2008 |
| TRIAL JUDGE: | HON. BOBBY BURT DELAUGHTER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | LEONARD McCLELLAN |
| ATTORNEY FOR APPELLEES: | LANCE L. STEVENS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED AND REMANDED. ON CROSS-APPEAL: REVERSED AND REMANDED - 09/09/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND PIERCE, JJ.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1.     This appeal arises from the trial court's grant of summary judgment in an action between an attorney and his former clients.  Gloria Thompson and Deborah Dixon sued attorney Herbert Lee, Jr., who represented them in diet-drug litigation, for breach of contract, tortious breach of contract, failure to accurately refund their portion of a multi-district litigation fee, and under the theory of quantum meruit. The trial court granted partial summary judgment to the plaintiffs and partial summary judgment to the defendant. Both parties appeal.

**FACTS**

¶2.    Gloria Thompson and Deborah Dixon (collectively referred to as "the plaintiffs") hired attorney Herbert Lee, Jr., to represent them in diet-drug litigation (commonly referred to as Fen/Phen claims) against the diet-drug manufacturer, American Home Products ("AHP"). They were among thirteen plaintiffs who hired Lee to represent them in the diet drug suit against AHP on a contingency-fee basis. The parties dispute whether the contingency fee agreed to was forty percent or forty-five percent.

¶3.    The diet-drug lawsuit was filed on behalf of the thirteen plaintiffs in the Circuit Court of Holmes County, Mississippi, and settled for an aggregate amount of approximately $32 million. As part of the settlement, a Multi District Litigation 1203[1] ("MDL 1203") assessment

---

[1]MDL 1203: United States Courts' Multidistrict Litigation, Action No. 1203, ***In Re: Diet Drugs*** "consolidates, for pretrial purposes, all federal litigation relating to use of the diet drugs Phentermine, Fenfluramine, and Dexfenfluramine. Collectively, these drugs are commonly referred to as 'Fen/Phen'." www.fenphen1203.com.  "Any action pending in any state court which relates to the personal injuries allegedly caused by the [Fen/Phen drugs] is eligible for State-Federal coordination." MDL 1203 Pretrial Order No. 467. (Feb. 10, 1999).  The history of MDL 1203 is as follows:

From 1989 through September, 1997, Wyeth marketed and sold two prescription drugs for weight loss in the United States under the brand names Pondimin (fenfluramine) and Redux (dexfenfluramine) (hereinafter "diet drugs"). Beginning in 1992, physicians commonly prescribed Pondimin in combination with phentermine, another prescription diet drug. Phentermine was and still is distributed and sold under several different brand names. The combination of Pondimin with phentermine was often referred to as "fen-phen." Wyeth had significant sales of both Pondimin and Redux in the mid-1990's. From January, 1995 until mid-September, 1997, approximately four million persons in the United States took Pondimin. Similarly, from June, 1996 through September, 1997, two million people in this country used Redux.

During the period from March to August, 1997 the Mayo Clinic in Rochester, Minnesota observed and reported an association between the use of fenfluramine and/or dexfenfluramine and valvular heart disease ("VHD"). On September 15, 1997, Wyeth and the Food and Drug Administration ("FDA") announced that there would be no further sales of Pondimin and Redux in the United States. Since that time, epidemiological studies have established a causal relationship between fenfluramine and dexfenfluramine and VHD. These studies have also determined that fenfluramine and dexfenfluramine cause a fatal but rare disease known as primary pulmonary hypertension ("PPH").

A tidal wave of litigation followed the withdrawal of Pondimin and Redux. Individuals who had ingested diet drugs filed lawsuits and class actions in federal and state

2

fee of six percent of the total settlement was withheld and sent to the MDL 1203 Fee and Cost Account. The six percent fee resulted from Lee contracting with the Plaintiffs' Management Committee ("PMC") of MDL 1203 to provide he and his clients certain "common benefit" discovery material.

¶4.  Both plaintiffs signed disclosure sheets documenting the disbursal of funds prior to receiving their portion of the settlement. They allege they were coerced by Lee into signing the disclosure sheet. Thompson received the largest settlement award of Lee's thirteen diet-

---

courts against Wyeth and other defendants, including manufacturers, distributors, weight-loss clinics, pharmacies and physicians. On December 10, 1997, the Judicial Panel on Multidistrict Litigation (the "JPML") designated the United States District Court for the Eastern District of Pennsylvania as the transferee court for IN RE: DIET DRUGS (PHENTERMINE/FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION, MDL 1203 ("MDL 1203"). *See* 28 U.S.C. § 1407. All cases filed in the federal judicial system were subsequently transferred to the Eastern District of Pennsylvania for coordinated and consolidated pretrial proceedings. To date, at least 105,000 plaintiffs have filed lawsuits, over 130 class actions were transferred to the MDL and the claims of more than 35,000 plaintiffs have been transferred by the JPML to [the Eastern District of Pennsylvania].

Shortly after the first transfer of cases to MDL 1203, the court established the Plaintiffs' Management Committee ("PMC") to oversee the coordinated and consolidated pretrial proceedings and to conduct discovery of widespread applicability on behalf of plaintiffs in MDL 1203. . . .As part of its duties and responsibilities, the PMC assisted and continues to assist all plaintiffs in MDL 1203 and state-federal coordinated proceedings by appearing frequently before [the United States District Court for the Eastern District of Pennsylvania], attending regular status conferences held by the Special Discovery Master, . . . preparing motions and responses regarding case-wide discovery matters and other pretrial issues, and maintaining a document depository for all documents produced in MDL 1203.

The PMC was also charged with establishing a Discovery Committee, which consisted of PMC members as well as additional lawyers representing plaintiffs in various state courts. . . . The PMC Discovery Committee coordinated and completed numerous depositions of defendants' corporate representatives, employees and generic experts. The court permitted the PMC and the co-chairs of the PMC Discovery Committee to assign work to other "common benefit" attorneys.

*In re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, 553 F. Supp. 2d 442, 449-50 (E.D. Pa. 2008).

drug clients, more than $7.4 million. Dixon received the third largest settlement award, which was more than $3.1 million.

¶5.    More than a year after the settlement of the plaintiffs' cases against AHP, the trustee of the MDL 1203 fund made a determination that one-third of all the sums deposited into the MDL 1203 Fee and Cost Account should be returned to those who had contributed them through a process approved by the MDL trustee's office. Consequently, two percent of Lee's diet-drug clients' $32 million settlement was returned to Lee. In allocating the refund, Lee retained forty-five percent as his attorney's fee and refunded each client a per capita share, rather than a pro rata share, of the remaining fifty-five percent. This resulted in each of Lee's diet-drug clients receiving one-thirteenth of the refund instead of an amount based on a percentage of the total settlement the client received. However, Lee no longer represented Thompson and Dixon and they would not sign the necessary acknowledgment and consent form; therefore, their refund was not sent to Lee for disbursement. The refunds allocated for Thompson and Dixon still remain on deposit with the MDL 1203 Trustee.

¶6.    Thompson and Dixon subsequently filed the present lawsuit against Lee, claiming breach of contract, tortious breach of contract, failure to properly refund the plaintiffs their MDL fees, and that Lee is only entitled to be paid on a quantum meruit basis. Lee filed a motion for summary judgment alleging that no genuine issue of material fact existed regarding whether the plaintiffs had signed the retainer agreements and disbursement sheets authorizing a forty-five percent contingency fee. The motion further alleges that no genuine issue of material fact exists as to whether the plaintiffs were assessed the same amount of money for

4

the MDL fees as Lee's eleven other diet-drug clients. Lee argued he was entitled to judgment as a matter of law and requested that the court grant summary judgment in his favor.

¶7. Thompson and Dixon filed a response to Lee's motion for summary judgment and moved the trial court to grant partial summary judgment in their favor. The plaintiffs' motion alleged that Lee refused to produce original copies of the contingency-fee contract and questions the genuineness and authenticity of the photocopy that was produced and the circumstances surrounding its production. The motion further alleged that genuine issues of material fact existed as evidenced by "substantial written documentation and sworn testimony" as to whether Lee overcharged the plaintiffs for attorney's fees. Finally, the plaintiffs' motion claimed that no genuine issue of material fact existed as to whether the MDL fee refund was misappropriated by Lee. The plaintiffs requested the trial court to grant partial summary judgment as to the MDL fee issue.

¶8. The trial court entered a memorandum opinion and order granting partial summary judgment to both parties. The trial court found that "upon signing the settlement disbursement sheet, plaintiffs became aware and agreed that Lee was retaining [forty-five percent] of their recoveries in attorney fees." Relying on this Court's holding in *Turner v. Wakefield*, 481 So. 2d 846, 848 (Miss. 1985), the trial court found that the plaintiffs had ratified the forty-five percent paid to Lee as attorney's fees and there existed no genuine issue of material fact with respect to the breach of contract and tortious breach of contract claims. The trial court granted summary judgment to Lee as to that issue. Because of this holding, the trial court also found that payment to Lee in quantum meruit is not appropriate and summary judgment was granted in favor of Lee on this claim, as well.

5

¶9.     With regard to the MDL fees, the trial court found that, "[t]he MDL Agreement entered into on behalf of his clients by Lee indicates that [six percent] of the settlement of *each* client shall be deposited in the MDL Fund." (emphasis added.)   The trial court further found that certain federal MDL 1203 pretrial orders were applicable in the present matter and required disbursement of the MDL refund on a pro rata basis.   Therefore, summary judgment was granted to the plaintiffs as to this issue.

**DISCUSSION**

¶10.     Lee appeals from the trial court's decision and the plaintiffs cross-appeal.  They raise the following issues:

> **I.      Whether the trial court erred in granting summary judgment to Thompson and Dixon regarding the MDL refund.**
>
> **II.     Whether the trial court lacked jurisdiction to enforce federal court orders.**
>
> **III.    Whether the trial court erred in granting summary judgment to Lee regarding the contingency fee.**

¶11.     A trial court's grant or denial of summary judgment is reviewed de novo. ***Daniels v. GNB***, 629 So. 2d 595, 599 (Miss. 1993) (citing ***Mantachie Natural Gas Dist. v. Miss. Valley Gas Co.***, 594 So. 2d 1170, 1172 (Miss. 1992)).  In reviewing the record, the court must consider all the evidence in the light most favorable to the nonmoving party when deciding to grant or deny summary judgment. ***Edmonds v. Williamson***, 13 So. 3d 1283, 1287-88 (Miss. 2009) (citing ***United States Fid. & Guar. Co. v. Martin***, 998 So. 2d 956, 962 (Miss. 2008)).  Further, the "trial court's grant of summary judgment shall be affirmed 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the

6

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" ***Germany v. Denbury Onshore, LLC,*** 984 So. 2d 270, 275 (Miss. 2008) (quoting Miss. R. Civ. P. 56(c)).

### I. MDL Refund

¶12. Lee complains that the trial court incorrectly relied on three pretrial orders entered by the United States District Court for the Eastern District of Pennsylvania, MDL 1203 Pre-Trial Orders 467, 517, and 2152, in granting summary judgment to the plaintiffs on the issue of the MDL fee refund. Lee alleges that these pretrial orders are inapplicable because no mechanism exists to transfer a case from a Mississippi state court to a federal MDL court and because the Circuit Court of Holmes County did not enter an order as required by the language of Pre-Trial Order No. 467.

¶13. In his opinion, the trial judge pointed out that Pre-Trial Order No. 467 "states that all state court actions are eligible for state-federal coordination under the orders, provided that the state court orders such coordination." The trial court reviewed the orders and the agreement entered into between Lee and the PMC of MDL 1203, and concluded that the pretrial orders were applicable in the present matter. Because the trial court was of the opinion that the orders were applicable, it held that the MDL Refund was to be administered on a pro rata basis and granted summary judgment in favor of the plaintiffs on this issue.

*The MDL 1203 Pre-Trial Orders*

¶14. MDL 1203 Pre-Trial Order 467 established a system in which a certain percentage of all MDL 1203 settlements would be sequestered so that the funds would be "available to provide for reimbursement of costs and payment of attorneys' fees to the Plaintiffs'

7

Management Committee . . . to perform work for the benefit of plaintiffs in MDL 1203 and in any state-court proceedings coordinated hereunder." MDL 1203 Pre-Trial Order 467 (Feb. 10, 1999). The order further states, "*All* funds in the account will be held as funds subject to the direction of the Court." MDL 1203 Pre-Trial Order 467 (Feb. 10, 1999) (emphasis added). "The Court" refers to the United States District Court for the Eastern District of Pennsylvania, the court which issued the order.

¶15. With regard to diet-drug cases in state courts, Pre-Trial Order 467 further states:

> Any action pending in any state court which relates to the personal injuries allegedly caused by [the diet drugs] is eligible for State-Federal coordination under the terms of this Order provided that the action is subject to an order entered by the Court having jurisdiction over the action which provides substantially as follows:
>
> > a. All state court actions subject to the state court order are eligible for state-federal coordination under this Pretrial Order entered in MDL 1203;
> >
> > b. Before making any claim payment to any plaintiff, all defendants in each action subject to the state court order, shall deduct from such payment an amount equal to [six percent] of the aggregate of the amount being paid and any amounts to be paid in the future and shall pay such sum for deposit into the MDL 1203 Fee and Cost Account . . .
> >
> > c. The parties in each state-court action subject to the state-court order are prohibited from using any of the PMC's or plaintiffs' work product . . . for any purpose other than the litigation ofactions pending in federal court and actions pending in state courts which qualify for state-federal coordination pursuant to the terms of this PTO.

MDL 1203 Pre-Trial Order 467 (Feb. 10, 1999). Lee argues that since no such order was entered by the Circuit Court of Holmes County, the Pre-Trial Orders are inapplicable.

8

¶16.  MDL 1203 Pre-Trial Order 517 states that Pre-Trial Order 467 "is hereby extended to all MDL No. 1203 civil actions, irrespective of the jurisdictions from which the actions were transferred."  MDL 1203 Pre-Trial Order 517 (March 18, 1999).  Pre-Trial Order 517 is inapplicable because the underlying diet-drug suit was never transferred into or out of the Eastern District of Pennsylvania, but rather Lee simply contracted with the PMC for the "common benefit" discovery.

¶17.  MDL 1203 Pre-Trial Order 2152 sought to clarify Pre-Trial Orders 467 and 517.  It stated,  "Defendants are required to withhold [nine percent][2] from the gross amount of *each* Claim."  MDL 1203 Pre-Trial Order 2152 (Sept. 12, 2001) (emphasis added.)  The order further stated, "a plaintiff's attorney is required to determine the amount owed to the attorney under the terms of his or her retention agreement and reduce the amount owed under the retention agreement by the amount withheld under the [nine-percent] assessment.  The plaintiff's recovery shall not be affected by the [nine-percent] assessment."  MDL Pre-Trial Order 2152 (Sept. 12, 2001).  The trial court found that Pre-Trial Order 2152's language required that the MDL fee be taken from *each* claim, and should therefore be refunded to *each* claim on a pro rata basis.

¶18.  We find that the MDL 1203 Pre-Trial Orders 467 and 2152 are applicable in the present matter.  In his motion for summary judgment, Lee admits:

> In order to successfully and economically prosecute his diet drug case, [Lee] participated in the Multi District Litigation (MDL) Common Benefit Fund in which all participating parties agreed to pay [six percent] of their recovery as

---

[2] A nine-percent fee was charged to MDL 1203 cases which were being litigated in the federal court system.  A six-percent fee was charged to MDL 1203 cases which were state-federal coordinated cases.

9

a fee for use of expert witnesses, litigation materials and other documents necessary to litigate diet drug claims.

Lee argued at the hearing and now on appeal that no order existed in the underlying action subjecting the diet-drug litigation in the Holmes County Circuit Court to the federal MDL orders. The plaintiffs did not provide such an order in response, and none can be found in the record. However, the trial court reviewed the contract between Lee and the PMC of MDL 1203 and the language of the Pre-Trial Orders themselves, and determined the orders to be applicable. The trial court was correct in this determination.

¶19. MDL 1203 Pre-Trial Order 467 specifically states, "The Court shall establish an insured, interest bearing escrow account to receive and disburse funds as provided in this Order. The Court will, by future Order, designate an escrow agent to manage the account. *All funds in the account will be held as funds subject to the direction of the Court.*" MDL 1203 Pre-Trial Order 467 ¶ 5 (Feb. 10, 1999). Lee admits that he willingly participated in the MDL Common Benefit Fund, and therefore he voluntarily subjected himself to the orders of the United States District Court for the Eastern District of Pennsylvania in regard to the funds he placed in the MDL account. Therefore, the Pre-Trial Orders are applicable.

¶20. Because the Pre-Trial Orders are applicable, the trial court was correct in granting summary judgment to the plaintiffs as to the issue of whether the MDL refund was to be distributed on a pro rata basis. MDL 1203 Pre-Trial Order 2152 provides specific instructions as to how the MDL fee is to be paid. The percentage owed to the MDL Fund is to be deducted entirely from the attorney's fees, not the client's recovery. The order provides the following example:

Assumptions: Jane Doe has entered into a contingency fee agreement with her attorney that provides for a forty percent fee to be calculated after the deduction of expenses from a gross settlement or judgment amount. Jane Doe has accepted an offer to settle her MDL 1203 case for $100,000.00.

Distribution:

| | |
|---|---|
| $100,000.00 | Gross Settlement Amount |
| -  $9,000.00 | [Nine Percent] Assessment[3] (Deducted By AHP)[4] |
| $91,000.00 | Settlement Payment to Jane Doe's Attorney |
| | |
| $91,000.00 | Settlement Payment to Jane Doe's Attorney |
| -  $5,000.00 | Litigation Expenses |
| $86,000.00 | Net Settlement Recovery |
| | |
| $86,000.00 | Net Settlement Recovery |
| - $29,000.00 | Contingency Fee After Deduction of [Nine Percent] Assessment ($95,000.00 x 40% = $38,000.00 - $9,000.00) |
| | |
| **$57,000.00** | **Balance to Client** |

¶21. Lee argued in his motion for summary judgment and now on appeal that "each of [Lee's thirteen] diet-drug clients paid an equal amount of the Common Benefit Fund because each received equal benefits from the funds. Thus, each paid [one-thirteenth] of the total amount." Lee further argued, "Neither Thompson nor Dixon paid into the MDL Fund based upon the amount of their individual settlements and are not entitled to refunds based upon the amounts of their individual settlement amounts." However, Lee's argument is mathematically illogical because the assessment was a percentage, rather than a specific dollar amount. Each

---

[3]The example given was a case in the federal court system, in which the charge was nine percent. The state-federal coordinated cases were assessed only six percent of their settlement as the MDL fee. Regardless, the formula would work in the same manner.

[4]MDL 1203 Pre-Trial Order 467 provided that the defendants in the diet-drug litigation (American Home Products) would send nine percent of the settlement amount (or six percent where applicable) directly to the MDL fund prior to distributing the remaining settlement balance to the plaintiffs.

client cannot contribute the same amount when the assessment is a percent of their recovery unless each client recovers the same amount.

¶22. Based on the requirements of Pre-Trial Order 2152, as evidenced by the above example, the entire six-percent MDL fee was to be deducted from Lee's attorney's fees. Payments to all of Lee's thirteen diet-drug clients should have been made in this manner. Had that been done, the entire two-percent refund would have belonged to Lee – as the entirety of the MDL 1203 fee would have been deducted entirely from his attorney's fees. Therefore, the trial court was correct in granting summary judgment to the plaintiffs as to the MDL refunds because there is no genuine issue of material fact that such payments should have been made on a pro rata basis. However, this issue must be remanded to the trial court to determine if the settlement was distributed in accordance with MDL 1203 Pre-Trial Order 2152, and if not, to order such distribution.

## II. Jurisdiction

¶23. Lee questions the trial court's jurisdiction to hear this case and further complains that the trial court improperly granted full faith and credit to the order of a foreign court in granting the plaintiffs summary judgment on this issue of the MDL fee refund. Lee cites *In re: Zyprexia Products Liability Litigation*, 467 F. Supp. 2d 256, 268 (E.D.N.Y. 2006), and *In re: Showa Denko K.K. L-Tryptophan Products Liability Litigation*, 953 F.2d 162 (4th Cir. 1992), as authority for the proposition that the trial court lacked jurisdiction to enforce the federal orders. Lee also claims Thompson and Dixon did not follow the procedure established by the Uniform Enforcement of Foreign Judgments Act, Mississippi Code Sections 11-7-301

12

through 11-7-309, in order to have the MDL 1203 Pre-Trial Orders enforced in the present action. *See* Miss. Code Ann. § § 11-7-301 to 11-7-309 (Rev. 2004.)

¶24.    *In re: Zyprexia* and *In re: Showa Denko K.K.* are both federal cases reviewing pre-trial orders in unrelated Multi-District Litigation matters.  *In re: Zyprexia* is a trial court ruling on a motion by the Plaintiffs' Steering Committee ("PSC") of an MDL matter in the United States District Court for the Eastern District of New York.  The PSC sought funding partly through requiring a portion of every recovery paid to plaintiffs' attorneys in state courts where the state plaintiff's attorney also represented federal plaintiffs to be paid into a common benefit fund.  The trial court ruled that "such compulsion would be inappropriate." *In re: Zyprexia*,  467 F. Supp. 2d at 268.  However, those facts are distinguishable from the present matter.  The order at issue in *In re: Zyprexia* would have compelled any attorney who represented clients in both state and federal courts involuntarily to pay a portion of his or her fees into the common-benefit fund.  In the present matter, Lee purposefully and willfully availed himself of the common-benefit discovery and agreed to pay into the MDL fund in exchange. Therefore, the *In re: Zyprexia* holding is inapplicable.

¶25.    *In re: Showa Denko K.K.* is a federal appellate-court decision which struck portions of a trial court order providing funding for the PSC in that particular MDL.  *In re: Showa Denko K.K.*, 953 F. 2d at 162.  The portions which were struck required payment from plaintiffs' attorneys in state cases in which any MDL defendant was a party or payor. *In re: Showa Denko K.K.*, 953 F.2d at 164.  The United States Court of Appeals for the Fourth Circuit held that the portion of the order which "compels contributions from plaintiffs in state . . . litigation who are not before the court" to have an "impermissible reach." *Id.*  at 166.  The

13

court held that those portions must be stricken from the order because they were "improperly broad." *Id.* Again, the present case is distinguishable in that the order at issue in *In re: Showa Dinko K.K.* compelled payment from attorneys who had not purposefully and willfully availed themselves of the benefit of the MDL discovery and agreed to pay compensation in exchange for such benefit.

¶26. Lee has clearly stated that in order "to successfully and economically prosecute his diet drug case, [Lee] participated in the [MDL] Common Benefit Fund in which all participating parties agreed to pay [six percent] of their recovery as a fee." Lee purposefully and willfully sought the benefit of the MDL discovery and agreed to pay into the Common Benefit Fund in exchange. Therefore, Lee's argument that *In re: Zyprexia* and *In re: Showa Denko K.K.* bar this Court from enforcing the federal court orders to which he willingly submitted himself is without merit.

¶27. Further, Lee claims the plaintiffs, Thompson and Dixon, should have followed the procedure laid out in the Uniform Enforcement of Foreign Judgments Act*,* Mississippi Code Sections 11-7-301 through 11-7-309, in order the have the MDL 1203 Pre-Trial Orders enforced in the Circuit Court of Holmes County. However, the procedure set forth in the Uniform Enforcement of Foreign Judgments Act is applicable to final judgments upon which collection can be made - - not pretrial orders. This issue also is without merit.

### III. Contingency Fee

¶28. Finally, on cross-appeal, Thompson and Dixon allege the trial court erred in granting summary judgment to Lee regarding the disputed contingency fee. Thompson and Dixon claim they signed contingency-fee agreements that stipulated that Lee would earn forty

percent of their settlement, but that Lee instead charged them forty-five percent. The trial court ruled that the plaintiffs had ratified Lee retaining forty-five percent of the settlement by accepting their settlement funds with knowledge that Lee was retaining forty-five percent of their recoveries. The trial court concluded that such knowledge was imparted to the plaintiffs when they signed the settlement disbursement sheet which indicated that Lee would be paid forty-five percent of the settlement. Therefore, summary judgment was granted in Lee's favor as to this issue.

¶29. As evidence that a genuine issue of material fact exists as to the amount of the agreed-upon contingency fee, the plaintiffs point to the following: conflicting testimony regarding whether the contingency-fee contracts provided for attorney's fees of forty-five percent or forty percent of the settlement, Lee's apparent inability to produce original contingency-fee contracts, the disputed nature of the photocopied contract's authenticity, and the alleged intimidation and coercion under which Thompson and Dixon signed their settlement disbursement statements. Furthermore, Dixon testified at her deposition that she had discussed the attorney-fee issue with four of the other diet-drug plaintiffs, and they had agreed that their original contingency-fee contract was for forty percent, but when they went to sign their settlement disbursement sheet the fee was forty-five percent. However, one of the four later recanted her story.

¶30. Thompson and Dixon further claim they had tremendous trouble obtaining and copying their client file from Lee. The record contains significant documentation as to the steps they took to obtain the client file. When the plaintiffs finally received their files to copy, neither an original nor a copy of the contingency-fee contract was located in the file. Copies of the

15

retainer agreements stating the contingency fee was forty-five percent were eventually produced. However, the plaintiffs question their authenticity and claim their signatures appear to have been cut and pasted onto the documents.

¶31. Further, the plaintiffs claim in their briefs that they were coerced into signing the settlement-disbursement sheets at the time they originally received their portion of the settlement. However, Thompson testified in her deposition that when she went to pick up her settlement check, Lee explained, "this is what your settlement amount was. This is my attorney fees." She went on to testify that the reason she signed the settlement disbursement sheet to receive her check – despite the questions she had regarding the attorney's fees – was that "it really didn't matter. . . when I did get what he told me I was going to get, I was going to have more money than I would ever spend in my life." Thompson testified that Lee only spoke harshly and used profanity when she questioned him about the MDL refund.

¶32. Dixon also testified at her deposition that she began to question the contingency fee when she heard "rumors" that the contingency fee between Lee and his diet-drug clients was forty-five percent. Dixon then said, "I called Sharon Lee[, Lee's wife,] and asked her about the [forty-five] percent. She told me it went up. I said, 'How can it just go up?' She said because no other attorney was settling the fen-phen cases for [forty] percent."

¶33. When asked why she signed the settlement-disbursement sheet that clearly stated she was paying forty-five percent in attorney's fees, Dixon answered, "Lee told me if we didn't sign, that we was [sic] gonna [sic] have to pay him and still find another attorney. And who was gonna [sic] start all over when we done got to this point?" Dixon testified that she did

16

not confront Lee about the alleged increase in attorney's fees because she already had asked

Sharon Lee about the issue on the telephone, and been told the fees "went up."

¶34. Thompson and Dixon cite this Court's recent decision in ***Waggoner v. Williamson,*** 8

So. 3d 147 (Miss. 2009), for the proposition that settling a claim does not waive the client's

right to pursue a suit against the attorney. It is true that this Court does not accept the

proposition that "because the plaintiffs accepted the settlement funds, that they waived any

right to sue for malpractice" ***Id.*** at 156 (quoting ***Channel v. Loyacono***, 954 So. 2d 415, 426

(Miss. 2007)), however, that is not the ruling the trial court made in the present matter. The

trial court held that in signing the settlement-disbursement sheet, the plaintiffs became aware

that Lee was retaining forty-five percent of their recovery as attorney's fees and agreed to let

him do so. The trial court based its ruling on this Court's holding in ***Turner v. Wakefield***, 481

So. 2d 846, 848 (Miss. 1985), wherein this Court adopted that appellants' reasoning:

> Where one is induced through false and fraudulent representations to enter into
> an agreement upon discovery thereof, he has an election to either rescind, in
> which event he must tender back that which he has received, or he may affirm
> the agreement, and maintain his action in damages for deceit, but his election
> must be promptly made, and, and when once made, is final. If one elects to
> affirm the agreement, after full knowledge with the truth respecting the false
> and fraudulent representation, and thereafter continues to carry it out and
> receive its benefits, he may not thereafter maintain an action in damages for
> deceit, because this would constitute a ratification of the agreement and
> condemnation of the fraud; otherwise one might, with knowledge of fraud,
> speculate upon the advantages or disadvantages of an agreement, receive its
> benefits, and thereafter repudiate all its obligations.

***Id.*** (citing ***Stoner v. Marshall***, 145 Colo. 352, 358 P.2d 1021 (1961)). The Court restated this

rule by saying, "assuming the fact of fraud, a contract obligation obtained by fraudulent

representation is not void, but voidable. Upon discovery thereof, the one defrauded must act

promptly and finally to repudiate the agreement; however, a continuance to ratify the contract terms constitutes a waiver." *Id.* at 848-49.

¶35. However, distinguishing the present case from the rule set forth in *Turner* are the allegations of coercion. "The law will presume that the contract was freely entered into by the parties without coercion or overreaching." *Singer v. Tatum*, 251 Miss. 661, 691, 171 So. 2d 134, 148 (1965). Both plaintiffs allege Lee coerced them into signing the disbursement sheets which stated Lee's fee was forty-five percent, because Lee stated that their failure to do so would delay their compensation or prevent it all together. Both Thompson and Dixon allege that their attorney – who owed them all of the fiduciary duties which are part of the attorney-client relationship – "strong-armed" them into signing the disbursement sheets.

¶36. This matter must be remanded to the trial court for the finder of fact to determine if such coercion was present at the time the disbursement sheets were signed, keeping in mind the fiduciary relationship between a lawyer and his client. If such coercion is found, the *Turner* rule will be inapplicable. It will be a question for the jury as to whether Thompson and Dixon originally entered a contract with Lee to pay him forty percent or forty-five percent of their recovery. Therefore, the trial court is reversed as to this issue.

## CONCLUSION

¶37. The trial court did not err in granting summary judgment to the plaintiffs on the issue of the MDL refund. This case must be remanded, however, to determine if the MDL fees were paid in accordance with MDL 1203 Pre-Trial Order 2152, and if not, to order such distribution. The trial court erred in granting summary judgment to the defendant as to the breach-of-contract claim, and the matter must also be remanded on this issue. Further,

18

because the breach-of-contract claim has been remanded, so must the claims for tortious breach of contract, fraud, and quantum meruit, as they are contingent on the determination of the breach-of-contract claim. Therefore, the trial court's judgment is affirmed on direct appeal, reversed on cross-appeal, and this case is remanded to the trial court for further proceedings consistent with this opinion.

¶38. **ON DIRECT APPEAL: AFFIRMED AND REMANDED. ON CROSS-APPEAL: REVERSED AND REMANDED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, LAMAR, KITCHENS AND CHANDLER, JJ., CONCUR. GRAVES, P.J., NOT PARTICIPATING.**